STATE OF MISSOURI at the Relation of the PRUDENTIAL INSURANCE COMPANY OF AMERICA, a Corporation, Relator, v. EWING C. BLAND, NICK T. CAVE and SAMUEL A. DEW, JUDGES OF THE KANSAS CITY COURT OF APPEALS.—No. 39399.—190 S. W. (2d) 234.

Court en Banc, September 4, 1945.

Rehearing Denied, November 5, 1945.

*Roy P. Swanson* and *Henry I. Eager* for relator; *Harry H. Edel* and *Michaels, Blackmar, Newkirk, Eager & Swanson* of counsel.

496

*Cornelius Roach, Daniel L. Brenner* and *Theodore F. Houx, Jr.,* for respondents.

ELLISON, J.—Certiorari to the respondent judges of the Kansas City Court of Appeals to review their record and opinion in Carr v. Prudential Ins. Co. of America, 184 S. W. (2d) 133. We shall not attempt to recount the facts in full, as they will be found in respondents' opinion.

The plaintiff Carr sued the relator Insurance Company in the circuit court on two $2000 insurance policies on the life of his deceased wife. He recovered judgment on both policies. The trial court sustained relator's motion for new trial on the ground that the plaintiff husband had not made a case for the jury. The plaintiff appealed and respondents' opinion reversed and remanded the cause with directions to reinstate the verdict and enter judgment thereon for plaintiff. The defenses of the relator Insurance Company, as appears from respondents' opinion, were that the issuance of the policies had been obtained by fraudulent collusion or conspiracy, and that there had been a breach of material conditions precedent in the policies.

There is little, if any, dispute about the facts. The five parties to the transactions involved were: the plaintiff husband, beneficiary in the two policies; his wife Mary, the insured, who was the owner of the business that plaintiff operated; Ted Minkin, an insurance agent

or broker who had sold insurance to plaintiff for many years, and who wrote the instant insurance; the relator Insurance Company, the insurer; and relator's examining physician. The first policy was issued on or about Jan. 7 and the second on Jan. 27, both in 1941. About 2-½ years earlier, in June, 1938, the wife's right breast had been amputated because of a lump diagnosed as cancer. In May, 1940, about seven months before the insurance was issued, she had been a hospital patient and received X-ray treatments for metastic (roving) cancer. She died of that disease on Jan. 4, 1942, about a year after the policies were issued.

The plaintiff husband knew of her condition; Minkin, the agent or broker, knew of it because plaintiff had told him; and the wife knew—must have known—of it. Neither the relator Insurance Company nor its examining physician knew of it unless—as to the relator, the knowledge of Minkin, the agent or broker, was imputable to it. All these facts the opinion concedes. The theory on which respondents' opinion decided the case was that: (1) the evidence made it a jury question whether Minkin was relator's agent (rather than a mere broker, or independent contractor); (2) if he was its agent relator was bound by his ▇▇▇▇ guilty knowledge; (3) notwithstanding the conceded guilty knowledge of the plaintiff, his wife and the agent Minkin *severally*, the evidence did not show *concerted* or collusive action between them, such as would prove conspiracy and purge the relator of the constructive knowledge derived through its agent.

On this question of concerted action the undisputed evidence is that the agent, Minkin, took the wife's Application for the first policy. It was in two parts, the first part containing only questions of a general nature, which she answered truthfully. In connection therewith, Minkin signed an "Agent's Statement" containing, among others, two questions inquiring: (1) whether the agent was aware of anything about the insured's health history that would render the risk undesirable; (2) whether she appeared in good health. He answered the first in the negative and the second in the affirmative. His answer to the first was absolutely false. It was not shown by direct evidence that the wife or husband knew of this. Neither was it shown that: Minkin knew of the wife's condition from *her*; or that she knew he had knowledge of it; or that she thought he had such knowledge.

The second part of the Application was to be filled in by the examining physician, who made the examination and interviewed the wife at Minkin's request. She answered these three questions thereon in the negative: (1) have you ever had a tumor or any disease of the breast; (2) what serious illness have you had; (3) what surgical operations have you undergone. Another question was: have you ever been in a hospital for observation or treatment. Her answer was, "Yes, normal confinement." All these answers were false, but it was

not shown by direct evidence that the husband or Minkin knew of them.

In applying for the second policy the wife merely executed a written Declaration reaffirming her application for the first policy: stating she ever since had been and then was in goôd health; and certifying that her declarations to the medical examiner in her first application were true as of the date of the second application, and might be used as a part thereof. Minkin did know of these recitals because he took this second application. There was no direct.evidence that the plaintiff husband participated in any of these transactions, though respondents' opinion says Minkin told him the wife "should have a policy."

Based on these facts the opinion ruled "there is no evidence whatever which tends to establish such a conspiracy or collusion," citing three cases,[1] the first decided by this court. The relator stresses two cases decided by this court and two Federal cases.[2] Looking to the cases cited by respondents, in marginal note 1, the first, or Hughes case, decided by this court, holds the only exception to the rule that knowledge of the agent will be imputed to principal, is where the agent and the applicant (for insurance) "act in fraudulent collusion in connection with the application." In the second, or Colegrove case, there was no evidence of any false answer in the application. Referring to the Emery case cited here by relator, and others following it, the Colegrove case said: "In each of those cases the question involved was false answers in the application which were made with the knowledge and acquiescence of both the insured and the agent."

In the third, or Longo case, the agent of the insurance company filled out the application with knowledge of the insured's history, without fraud or collusion between him and her. She had truthfully stated the facts to him, and it was not with her knowledge or that of her husband, the beneficiary, that the agent inserted false answers in the application. She honestly believed her past history (arrested tuberculosis) did not render her ineligible for insurance. This, the decision says, left no room for a claim of collusion between her and the agent of the insurance company.

Now compare these decisions with the Emery case, cited by relator and below in marginal note 2. The insured there had an exophthalmic or toxic goiter which was plainly visible. She had consulted two physicians, but was unwilling to submit to a surgical

---

[1] State ex rel. John Hancock Mut. Life Ins. Co. v. Hughes (Mo. Div. 1), 152 S. W. (2d) 132, 134 (3); Colegrove v. John Hancock Mut. Life Ins. Co. (St. L. Ct. App.), 153 S. W. (2d) 750, 751 (1); Longo v. John Hancock Mut. Life Ins. Co. (St. L. Ct. App.), 142 S. W. (2d) 871, 874 (3).

[2] Emery v. New York Life, 316 Mo. 1292, 1300, 295 S. W. 571, 573 (2); Leavell v. Blades, 237 Mo. 695, 703, 141 S. W. 893, 895; Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 622-24, 60 L. Ed. 1202, 36 S. Ct. 676; New York Life v. Fletcher, 117 U. S. 519, 533, 29 L. Ed. 934, 6 S. Ct. 837.

operation. Within six months she applied for insurance, and signed an application stating she had never had a disease of the nervous system, and had only consulted one named physician during the past five years, who removed her tonsils with good results. Within the next six months she underwent two goiter operations and died.

In the suit brought by the mother as beneficiary in the policy, the insurance company defended on the ground that the insured had concealed her disease of goiter, and the beneficiary by reply alleged the insured's medical examiner saw or should have seen it. The mother and a sister, who were present at the insurance examination, testified the goiter was plain to be seen, and that they saw the physician looking at the face and neck of the insured. That, the decision says, was a brief summary of the physician's knowledge of her goiter affliction. Then it held:

"The principle that the knowledge of an agent must be imputed to his principal is entirely inapplicable in a case where the conduct of the agent raises a clear presumption that he would not communicate the fact in controversy. . . . And such a presumption arises where the agent and the applicant for insurance join in an attempt to deceive the insurer and thus fraudulently procure insurance. An agent thus acting is not only stepping outside the limits of his authority, but is known to the applicant to be doing so. . . . 'If a person colludes with an agent to cheat the principal, the latter is not responsible for the acts or knowledge of the agent. The rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own frauds upon the principal.' [National Life Ins. Co. v. Minch, 53 N. Y. 144, 150.]

"It is not necessary that collusion on the part of the applicant and the agent be shown by direct evidence. Where an applicant falsely answers a question, and such falsity being known to the agent, he nevertheless writes out the answer and forwards the application to the insurer, who issues a policy thereon, it will be presumed that there was collusion between the applicant and the agent. [Tripple Link Mutual Ins. Assn. v. Williams, 121 Ala. 138.] In the instant case there was no specific finding by the court of collusion between the applicant and the medical examiner, but from the facts which the court did find the conclusion is inescapable that they were joint participants in the fraud attempted to be perpetrated upon defendant."

So, also, in Friedman v. John Hancock Mut. Life Ins. Co., 168 S. W. (2d) 956, 958(2) a later decision of the St. Louis Court of Appeals than either of the two cited by respondents, this is said: "if it should appear that the insured had participated with Gray in the attempt to deceive the company and thus fraudulently procure the issuance of the policies, then in that event Gray's knowledge would not

be imputed to defendant, since the rule which charges the company with what its agent knows is only for the benefit of an innocent applicant, and is not to be invoked by one who was in collusion with the agent so as to know that the latter would not transmit his information to the company." [Citing the Emery case, supra.]

If the evidence was circumstantially conclusive in the Emery case, much more so is it here. Respondents' opinion concedes agent Minkin and the insured wife both had guilty knowledge that she was not an insurable risk. And Minkin knew the wife realized—must have known—of her condition, as the opinion states. The plaintiff husband knew it too. His wife must have been aware that he had that knowledge. Whether she knew Minkin had been informed of her malady by her husband is not shown; but it does appear that they had a common objective and pursued parallel courses. The only missing links in a completely proven chain of fraud were that it was not established they had come out in the open by conspiring expressly with each other.

The Emery case is well buttressed with authority. In such instances as this proof by circumstantial evidence is by no means uncommon. Collusion is a less inclusive word than conspiracy, though substantially they are synonyms. 7 Words & Phrases (Perm. Ed.), p. 639. And of the latter it is said, 15 C. J. S., sec. 29, pp. 1043-4: "but since direct evidence is ordinarily in the possession ▆▆ and control of the alleged conspirators and seldom can be obtained, a conspiracy usually is susceptible of no other proof than that of circumstantial evidence, and therefore it is a well-settled rule that proof by direct and positive evidence is not necessary, and that circumstantial evidence, that is, evidence of the acts of the alleged conspirators and of the circumstances surrounding the transaction which is the basis of the charge, is admissible to prove the conspiracy charged; . . ." See also 12 C. J., sec. 226, pp. 633-4, and 11 Am. Jur., sec. 56, pp. 585-6.

There was no proof of express collusion in the Emery case. We think the facts there were sufficiently similar to those here; and that respondents' opinion clearly conflicts with it. Accordingly it is ordered that the same be quashed. All concur.