Mancil SMITH, Plaintiff-Respondent,

v.

Larry WELCH, Hitchin' Post, Inc., a Corporation, and James W. Noble, and Betty J. Noble, His Wife, Defendants-Appellants.

No. 11793.

Missouri Court of Appeals,
Southern District.

Jan. 21, 1981.

James E. Curry, John H. Tharp, Jr., Ava, Maurice W. Covert, Houston, for defendants-appellants.

Albert F. Turner, Mountain Grove, Daniel P. Wade, Ava, Harold J. Fisher, Lynn C. Rodgers, Woolsey, Fisher, Whiteaker & Stenger, Springfield, for plaintiff-respondent.

FLANIGAN, Judge.

Plaintiff Mancil Smith, a licensed real estate broker, brought this action against defendant Larry Welch, also a licensed real estate broker, and defendants James Noble and Betty Noble, his wife. All of the significant events took place in 1973.

On February 16 Mr. and Mrs. Noble, as "owners," entered into a listing agreement with plaintiff, as broker, by the terms of which the Nobles granted plaintiff "the exclusive right to sell" their farm for a period of three months ending May 15. The sale price was listed as $142,000 and plaintiff was to receive 10 percent of the sale price as his commission.

On May 13 Jacob Tanis and his wife Sally, accompanied by defendant Welch, inspected the farm with the permission of defendants Noble. On May 19 Jacob and Sally Tanis and his parents bought the farm from the Nobles for $160,000. Plaintiff was not paid a commission.

Count I of the petition sought actual damages in the sum of $16,000 and Count II sought punitive damages. The case was tried to a jury which found the issues in favor of plaintiff and awarded actual damages of $16,000 plus interest from May 13 against the three defendants and punitive damages of $2,000 against each of the three defendants. Defendants appeal.

■ Defendants, in their joint brief, challenge the sufficiency of the evidence to support the verdict, certain evidentiary rulings of the trial court, and the propriety of two instructions given on behalf of plaintiff. Appellate review is limited to those issues presented in defendants' points and they alone need be and are considered. *Pruellage v. De Seaton Corporation*, 380 S.W.2d 403, 405[3] (Mo.1964); *Brewer v. Blanton*, 555 S.W.2d 381, 383[1] (Mo.App. 1977).

Defendants' first point is that the plaintiff failed to make a submissible case and that the trial court erred in not sustaining defendants' motion for a directed verdict which was offered at the close of all the evidence. Defendants' first point is based upon two grounds: (a) Plaintiff's trial theory was based on conspiracy, as distinguished from tortious interference with a contract, and conspiracy alone is not actionable; (b) The evidence was insufficient in certain factual respects to be set forth later in this opinion.

■ Ground (a) is factually true in the sense that plaintiff's counsel at the trial informed the court, "We are not dealing with a tortious interference with a contract, we are dealing with a conspiracy." It is also true, as an abstract legal principle, that conspiracy alone is not actionable. "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." *Rosen v. Alside, Inc.*, 248 S.W.2d 638, 643[2, 3] (Mo.1952).

■ The existence of ground (a), standing alone, does not make defendants' first point a meritorious one. The validity of defendants' first point hinges upon ground (b) and that ground must be tested by determining whether any of the factual deficiencies do exist and, if so, if that existence is fatal to plaintiff's case. It is not the function of this court to determine whether plaintiff's case may be deficient in particulars not claimed by the appealing defendants.

The determination of whether a submissible case was made requires that the evidence be considered in the light most favorable to the plaintiff and plaintiff is to be given the benefit of all favorable inferences that reasonably may be drawn from such evidence. *Epple v. Western Auto Supply Co.*, 548 S.W.2d 535, 538[1] (Mo. banc 1977).

"A combination for the purpose of causing a breach of contract has been held to be an unlawful conspiracy. A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong." *Rosen v. Alside, Inc.*, supra, 248 S.W.2d at 643[4]. "[A] conspiracy usually is susceptible of no other proof than that of circumstantial evidence, and therefore it is a well-settled rule that proof by direct and positive evidence is not necessary, and that circumstantial evidence, that is, evidence of the acts of the alleged conspirators and of the circumstances surrounding the transaction which is the basis of the charge, is admissible to prove the conspiracy charged." *State v. Bland*, 354 Mo. 495, 190 S.W.2d 234, 237[2] (banc 1945).

Referring to the grant of an exclusive listing to a real estate broker the Kansas City Court of Appeals, in *Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell*, 329 S.W.2d 393, 396–397 (Mo.App.1959), said: "When the owner of the property is bound by a contract of the nature before us [and] conspires with a second broker, who knows that there is a contract of that nature in effect, to contract for the sale of that property within the contract agency time of the first broker and to conceal that fact from the first broker in order to deprive him of the commission to which he is entitled by withholding from him the fact that such sale has been agreed to and in pursuance thereof they carry out their conspiracy, the result is an actionable conspiracy and both the owner and the second broker are liable for the resulting damages."[1] See also 34 A.L.R.3d 720 (Liability of real estate broker

for interference with contract between vendor and another real estate broker).

By the terms of the listing agreement of February 16, entered into by plaintiff and defendants Noble, the Nobles granted to plaintiff, for a period of three months ending May 15, the exclusive right to sell the farm. The sale price was listed as $142,000 and plaintiff was to receive 10 percent of the sale price as his commission. The agreement called for payment of the commission "*if a buyer is found during the time this agreement is in force, or* the said property shall be sold to or exchanged with any person procured by [plaintiff] or by [the Nobles] or by any other person, *or* if the property is sold to anyone to whom the said property was submitted by [plaintiff] within three months from the termination date hereof."

Plaintiff informed other realtors, including defendant Welch, that the listing agreement of February 16 had been entered into. The record supports the inference that the information was imparted to Welch on or shortly after February 16.

On May 10 Jacob Tanis and his wife Sally, then residents of New Jersey, were interested in buying a farm in Missouri. They drove by the Noble farm, located near Ava, Missouri, and it aroused their interest. They went to Welch's real estate office in Ava and asked Welch if the Noble farm was for sale. Welch said he thought it was and that he would "run up and see if it was listed and for how much." Welch and another realtor, John Montgomery,[2] drove out to the farm while the Tanises waited at the office.

Defendant James Noble testified that he told Welch that the farm was listed with another broker. Noble said, "Welch asked

---

1. A federal district judge, sitting in Missouri, has stated, "[A] party to a contract cannot be liable for conspiracy to induce its breach." *Meyer v. Bell & Howell Co.*, 453 F.Supp. 801, 802[7] (E.D.Mo.1978). For conflicting lines of authority on that question see 15A C.J.S. Conspiracy § 13, p. 640; see also 16 Am.Jur.2d Conspiracy § 60, p. 273.

    The joint brief of defendants makes no attempt to distinguish between the sufficiency of the evidence to support the verdict against

Welch, on the one hand, and against the Nobles on the other. Whether such a distinction properly could have been made is not before this court.

2. Montgomery was an original defendant but died while the suit was pending. Plaintiff filed a dismissal as to Montgomery "for the reason that he left no estate." Plaintiff also dismissed with respect to another defendant.

me who that broker was and I did not tell him. I said I would rather not say." Noble testified that he told Welch that he did not think he would sell the farm and "would not take any less than $160,000."

Welch and Montgomery returned to Welch's office. Welch informed the Tanises that they could not see the Noble farm because it had an exclusive listing and that it was listed for $160,000. Sally Tanis asked Welch for the name of the other realtor. Welch told her that "the man was hard to work with" and did not divulge plaintiff's name. Montgomery drove the Tanises to Springfield. The Tanises then went to North Missouri where they looked at some farms.

On May 13 the Tanises returned to Springfield and telephoned Montgomery, who lived there. They informed Montgomery they wanted to see the Noble farm. It is a reasonable inference that Montgomery relayed this information to Welch because defendant Betty Noble testified that Welch telephoned her and obtained permission to bring the Tanises to the farm that day.

Montgomery drove the Tanises to Welch's office at Ava and met Welch. Welch told the Tanises, before taking them to the farm, that he could show the farm to them but that there was "no way possible to close it up on that date." Welch also told the Tanises that if someone "should happen to come around" while they were looking at the farm, "just tell them we [the Tanises] were interested in renting the small house in back." Welch told the Tanises "not to say nothing to nobody."

Montgomery's car was used to transport the Tanises, Welch and Montgomery to the farm. The reason Montgomery's car was used, rather than Welch's pickup, was that the pickup "had Welch's name on the side of it" and Welch "said he did not want his pickup on the farm because of the exclusive listing."

After the party of four arrived at the farm the Tanises, with the permission of the Nobles, inspected the farm and its improvements. While they were doing so, a car drove into the driveway. At that time

Welch said, "My goose is cooked now," and Mrs. Noble told the Tanises, "Say you are looking at the small house to rent." The driver of the car was merely seeking directions and the car left without further incident.

After inspecting the farm the Tanises returned to Welch's office and Welch told them of the terms of the purchase, including the price of $160,000. Tanis informed Welch that "I agreed to buy the farm on May 13" and offered Welch a check. Welch said he could not take a check that day and that if a check were given, it would have to be dated after May 15.

Although Tanis stated that his father was also interested in looking at the farm and in fact became a co-purchaser of it a few days later, the Tanises were willing to make the purchase themselves on May 13 and the subsequent participation of Tanis's father was not a condition of the purchase but merely a circumstance.

On May 19, 1973, a sale agreement was entered into between defendant James Noble and the elder Tanis. The agreement provided for the sale of the farm, for $160,000, from the Nobles to the younger and the elder Tanises. After this agreement was signed by the elder Tanis, Welch took it to Noble, together with a listing agreement providing for the payment of a 10 percent commission to Welch. Welch later split that commission with Montgomery. Noble signed the sale agreement and the listing agreement. On the same date Mrs. Noble wrote a letter to plaintiff in which she stated that the farm "was no longer for sale." The letter also stated that she and her husband had decided not to sell the farm.

On July 4, before the agreement of May 19 had been "closed," Jacob Tanis visited the farm. At that time Noble told Tanis that the broker who previously held the exclusive listing was "a little old lady in Hartville" and Noble "did not want to have any problems with her." Noble told Tanis "not to mingle too much with the neighbors or introduce myself until after I had moved there."

Defendants assert that plaintiff's case is flawed by the following factual deficiencies: (1) plaintiff did not sell the farm during the term of his listing agreement; (2) defendants did not interfere with plaintiff's "contractual right" during the term of his listing agreement; (3) no sale was made prior to May 15, the expiration date of plaintiff's listing agreement; (d) defendants Noble owed no duty to plaintiff "not to sell the farm after the expiration of the listing agreement at a greater price"; (5) there was no evidence that plaintiff "had a purchaser" during the term of his listing agreement or that defendants Noble refused to accept or to discourage a purchaser obtained by plaintiff; (6) Jacob Tanis, one of the ultimate purchasers, gave conflicting evidence concerning his willingness to purchase the farm on May 13.

Deficiency (1) exists but it has no significance for the reason that plaintiff's listing agreement imposed upon defendants Noble the duty to pay the commission "if a buyer is found during the time this agreement is in force." Alternative conditions giving rise to the same duty were also stated. The jury was entitled to believe that a buyer, in the persons of Jacob Tanis and his wife, was found on May 13 and that they were then ready, willing and able to make the purchase.

Deficiency (2) does not exist. Defendants Noble did not pay plaintiff his commission. The jury was entitled to find that the identify of the buyer, Tanis and wife, "found during the time this agreement is in force" was kept secret from plaintiff by the collusion of defendants. Concert of action among the defendants is inferable from all of the circumstances, not the least of which is that Mrs. Noble and Welch, at separate times, told the Tanises to tell the same lie in the event their presence at the farm on May 13 prompted inquiry. That lie was that the Tanises were there for the purpose of renting the small house. The jury was entitled to find that Welch knew of plaintiff's listing because plaintiff had informed him of it. Welch's credibility was rendered suspect when he testified that he sought, without success, to extract from Mr. Noble the identity of the holder of the exclusive listing. Welch told the Tanises that the holder of the listing, whose identity he would not divulge to the Tanises, was a man who was "hard to work with." Obviously Welch could not have the latter knowledge if he did not know the identity of the first realtor, plaintiff. Mr. Noble's credibility was undermined by his statement to Jacob Tanis, on July 4, that the first realtor was "a little old lady in Hartville," when such was not the fact. An overview of the record discloses concert of action on the part of the three defendants with the objective of depriving plaintiff of the commission to which he was entitled.

Deficiency (3) does exist but the making of a sale prior to May 15 was only one of the alternative conditions giving rise to plaintiff's right to the commission.

Deficiency (4) is a statement of a legal proposition rather than a factual one. As an abstraction it may be accurate but that does not remedy the fact that plaintiff's entitlement to a commission reached fruition on May 13.

Deficiency (5) exists but it has no significance for the reason that plaintiff was entitled to a commission if, as happened, "a buyer is found during the time this agreement is in force." Whether the buyer was found by plaintiff or by someone else was of no moment.

Deficiency (6) is of questionable existence. Counsel for defendants cross-examined Jacob Tanis at length with regard to his testimony in a prior case but it is debatable whether that testimony in fact conflicted with his direct testimony. Certainly if there was such a conflict it was not to the extent that Tanis's credibility was totally destroyed and his testimony rendered valueless. The jury was at liberty to believe that portion of his testimony which favored plaintiff.

The deficiencies of which defendants complain either do not exist or their existence is not fatal to plaintiff's claim.

Defendants' first point has no merit.

Defendants' second point reads: "If the plaintiff had a cause of action it would have been tortious interference with a contract, which he failed to plead and to prove, or tortious interference with his business, which he failed to plead and to prove; plaintiff claimed his action was not one of tortious interference with a contract or a business, but relied on his conspiracy theory." This point preserves nothing for appellate review for the reason that it fails to comply with Rule 84.04(d) [3] which requires that a point "state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous. . . ." See *Estate of Sample v. Travelers Indem. Co.*, 603 S.W.2d 942, 945[3] (Mo.1980).

Defendants' third point is that the trial court erred in admitting evidence, over defendants' objection, "regarding co-brokering practices and splitting fees between realtors." This evidence was objectionable, say defendants, because the practice was not pleaded in the petition.

Attached to the petition and incorporated in it was the listing agreement of February 16 between plaintiff and defendants Noble. One of the "general conditions" set forth in that agreement is: "Owners hereby authorize broker to co-broker the sale of this property or to list property in multiple-listing services." The listing agreement recites, "the owners acknowledge that the efforts and endeavors of the broker to procure a purchaser through . . . co-brokers . . . shall constitute good and sufficient consideration for this agreement." Pursuant to the quoted language, plaintiff did notify defendant Welch, as well as other realtors, of his exclusive listing.

The evidence specifically under attack was elicited during the direct examination of plaintiff by his counsel. Plaintiff testified that it "is a customary practice in this area among independent brokers to advise other independent brokers when they obtain a listing." The ground for the objection voiced by defendants' counsel was, "it is inadmissible under the pleadings." The

listing agreement had been previously admitted into evidence. Whether or not a custom existed, under the listing agreement plaintiff had the privilege of "co-brokering." In view of that fact, and in view of the ground posed in the objection, the trial court did not commit prejudicial error in receiving the evidence. Defendants' third point has no merit.

Defendants' fourth point is that the trial court erred in rejecting defendants' offer of proof that plaintiff did not produce a buyer. A sufficient answer to that contention is that during the examination of defendant Noble by his own counsel the following occurred:

"Q. (By Mr. Covert) Mr. Noble, did Mancil Smith, or anyone representing him, produce a buyer to you for the price of his listing during the term of his listing?

"A. No, no, sir."

Plaintiff's attorney objected to that testimony and moved that it be stricken. The court overruled the objection and the testimony was permitted to stand. Defendants' fourth point has no validity because it has no factual support.

Defendants' fifth point reads: "The trial court erred by not sustaining defendants' motion for directed verdict at the conclusion of all the evidence." This point violates Rule 84.04(d) for the reason that it fails to state "wherein and why" the action of the trial court is claimed to be erroneous. For the reasons stated in the discussion of defendants' first point, defendants' fifth point has no merit.

Defendants' sixth point is that the trial court erred in giving instruction 3. Instruction 3 was plaintiff's verdict-directing instruction which submitted the case against defendant Welch and defendants Noble. The instruction, in essence, submitted the ultimate facts with regard to the conspiracy and the acts taken pursuant to it.

Rule 70.03 requires that specific objections to instructions be made in the motion for new trial "unless made at trial." De-

3. All references to rules are to Missouri Rules of Court, V.A.M.R.

fendants made no objection to instruction 3 prior to filing their joint motion for new trial. The only specific objection contained in the motion is that instruction 3 does not "follow MAI 23.11."

■ MAI 23.11 is the form for a verdict-directing instruction submitting tortious interference with plaintiff's contract by a defendant who is not a party to that contract. MAI 23.11 was not proper for use in the instant case where plaintiff submitted his case on the conspiracy theory and the parties to the conspiracy included the defendants Noble, who were parties to plaintiff's listing agreement, and defendant Welch, who was not a party to that contract. MAI 23.11 does not purport to cover the elements of an actionable conspiracy and acts pursuant thereto. MAI 23.11 is appropriate only when the theory submitted is that of tortious interference with contract and only when the defendant is not a party to that contract.

Although defendants' brief assigns additional specific objections to instruction 3, those objections have not been preserved for appellate review. Defendants' sixth point has no merit.

Defendants' seventh point challenges instruction 5 given by the trial court at the instance of plaintiff. At the trial defendants made no objection to instruction 5 and instruction 5 is not mentioned in the motion for new trial. Defendants' seventh point has not been preserved for appellate review. Rule 70.03.

■ Defendants' eighth point reads: "The trial court erred in submitting to the jury punitive damages as part of plaintiff's cause of action." This point violates Rule 84.04(d) because it fails to state "wherein and why" the action of the trial court is claimed to be erroneous. Defendants draw no distinction between the answerability of defendant Welch and that of defendants Noble with respect to punitive damages.

In *Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell,* 353 S.W.2d 102 (Mo. App.1961) plaintiff, a realtor, sued a second realtor alleging that the latter had conspired with the landowner to defraud plaintiff of a real estate commission earned under an exclusive real estate agreement. Although the owner was originally joined as a defendant, plaintiff settled with the owner and the case proceeded to trial against the second realtor. A judgment of $100 actual damages and $7,500 punitive damages was affirmed on appeal.

"[S]ince a civil conspiracy to induce the breach of a contract sounds in tort, it may carry with it the assessment of punitive damages if done with malice or wantonness.... The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive." (Citing authorities.) *Mills v. Murray,* 472 S.W.2d 6, 17[18, 19] (Mo.App.1971). See also *Dickey v. Johnson,* 532 S.W.2d 487, 504[15] (Mo.App.1975); 15A C.J.S. Conspiracy § 33, p. 718; 16 Am.Jur.2d Conspiracy § 71, p. 282.

Defendants' defectively stated point does not refer to any factual deficiency which would relieve this record from the operation of the foregoing principles.

The judgment is affirmed.


GREENE, P. J., and TITUS, J., concur.