Irene **MEYER**, Appellant,

v.

**Eugene Walter MEYER and Mary Sue Meyer, Respondents.**

No. 15684.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 1, 1989.

Rehearing Denied Aug. 23, 1989.

Thomas E. Klinginsmith, Carthage, for appellant.

Herbert Douglas, Andrew P. Wood, Douglas, Douglas & Johnson, Neosho, for respondents.

CROW, Presiding Judge.

Plaintiff Irene Meyer filed a three-count petition against two defendants: her son, Eugene Walter Meyer ("Gene"), and Gene's wife, Mary Sue Meyer ("Mary"). In Count I plaintiff sought to eject defendants from an 80-acre tract of land owned by plaintiff. In Count II plaintiff sought actual and punitive damages for defendants' alleged wrongful occupancy. Count III pertained to sundry items of personal property. As this appeal presents no issue regarding the trial court's disposition of that count it requires no further mention.

Defendants counterclaimed, averring they hold the tract under an oral agreement (the particulars of which shall be set forth *infra*) whereby they are to become its owners upon plaintiff's death. Defendants prayed for judgment allowing them to remain in possession and granting them a vested remainder "which will ripen into full ownership" upon plaintiff's death. Alternatively, defendants prayed for $100,000 damages if the trial court ordered them off the property.

The trial court entered judgment for defendants on Counts I and II of plaintiff's petition, and granted defendants the possessory right and remainder interest they sought in their counterclaim, subject to a condition to be discussed *infra*.

Plaintiff appeals, briefing two points. Before addressing them we recount the pertinent facts, a task made easier by the comprehensive findings of fact authored by the trial court. In our narrative we incorporate many of that court's unchallenged findings.

By warranty deed executed January 8, 1963, plaintiff and her husband, Walter (Gene's father), acquired ownership—by purchase—of the tract in dispute, along with an 85-acre tract immediately east thereof, the two parcels being separated by a county road. Plaintiff and Walter established their "homeplace" on the 85-acre tract.

Gene, who was in military service at the time of the transaction, entered into a verbal agreement with Walter. It provided: (1) Gene and Mary would reside on the 80-acre tract, (2) Gene and Walter would farm both tracts jointly when Gene was released from military service, (3) Gene would take care of Walter and plaintiff, and (4) upon the deaths of Walter and plaintiff, the 80-acre tract would belong to Gene and Mary. Plaintiff and Mary knew about the agreement and assented to it.

After the agreement was made Gene paid Walter and plaintiff $127 per month to apply on the "mortgage payments." According to Gene he made eight such payments, after which the amount was reduced to $65 per month. He made 16 payments in that amount, terminating them when plaintiff received an "inheritance" enabling her and Walter to make the mortgage payments.

Gene's military service kept him in Germany until March, 1964, when he was assigned to Fort Leonard Wood. While stationed there he came home each weekend and worked on the farm, continuing this practice until his discharge in September of that year.

Gene and Mary moved into a house on the 80-acre tract, and Gene and Walter farmed the two tracts together. Because money was "very tight" it was decided by Gene and his parents that Gene would get an outside job. He did so, and he and Mary moved off the 80-acre tract, but they returned each weekend to help with the farming. In June, 1966, Gene and Mary moved back onto the 80-acre tract, and Gene and Walter resumed farming together. The operation included the milking of dairy cattle and the growing of row crops and silage. Gene testified he kept the cattle records, while Walter took care of the money.

The operation continued that way until March, 1971, when Walter suffered a heart attack. He was able to do only light work thereafter, so the milking operation was terminated and the dairy cattle were replaced by beef cattle.

Defendants had started their own beef herd in 1970. Their cattle and those owned by Walter and plaintiff were pastured together on both tracts. Hay was cut on both tracts and was stored "anywhere there was an open spot," irrespective of where it had grown. It was fed to all cattle without regard to ownership.

On April 17, 1973, Walter executed a will leaving all his estate to plaintiff on the condition that she survive him by more than 30 days. If she did not, the 80–acre tract was devised to Gene. Plaintiff simultaneously executed a will leaving all her estate to Walter subject to the same survival condition, and alternatively devising the 80–acre tract to Gene.

Walter suffered a stroke January 28, 1978, and was thereafter unable to work. From then on, Gene, aided by Mary and their children, did all the farm work and took care of all the cattle.

Walter died December 6, 1983. Defendants, with their children's help, continued farming both tracts and caring for all cattle. Gene made the decisions with respect to sale of plaintiff's cattle. When any were sold plaintiff would receive the sale bills and checks.

On July 22, 1985, plaintiff wrote Gene this letter:

"I am very disappointed with your attitude. First toward your father and me, now me. Your not coming to see him when he was so ill and dying. At the time I was to [sic] busy taking care of him and at night to [sic] tired to do much thinking. But now I am tired of getting the cold shoulder. The way it seems you think I should be satisfied with all you are doing.

Well, I am tired of being kept in the dark. So I am asking for the whole herd count and how many are mine. Also if there is any change by sales, death, or the like I want to know. Also I want to know ahead of time when you are going to sell any of my cows. I want to see them and know the reason why they are being sold. If they are to be sold you had better saved enough heifers to replace them. You always seem to sell my heifers.

Now if this isn't to your liking, you can cut out my cattle and bring them down here. Also you can bring back all the machinery and all the tools and everything else your father left up there when he had to quit. I have a list of everything. I will have a farm sale and you can just pay cash rent.

Oh! Yes, what about the loafing shed manure? It hasn!t [sic] been cleaned out for two or three years! I want an answer within a week!

s/ Mother"

Plaintiff's letter triggered a responsive letter from Mary. In substance it said, among other things, that defendants' attitude had been caused by plaintiff, that plaintiff had allowed Walter to languish without seeing a doctor, that plaintiff had wanted to get rid of most of her cattle and later had wanted more than she started with, that plaintiff had never bothered to find out what was going on, that if plaintiff wanted her herd put on the 85–acre tract she had better start looking for a bull because there would be no more free breeding, that defendants had a list of veterinarian charges and other expenses for the cattle which defendants had paid alone, that the whole herd count was none of plaintiff's business as she had no investment in defendants' herd, that some of plaintiff's heifers Gene had sold were unsuitable for breeding, that defendants had never cheated plaintiff out of a penny, that plaintiff had verbally degraded Gene three years earlier, that plaintiff had always wanted to kick defendants off the 80 acres but Walter wouldn't allow it, that plaintiff's herd numbered 32, and that plaintiff was not going to treat defendants like dogs anymore. Gene knew of, and approved, Mary's letter.

Gene testified that at the time of the letters, plaintiff's cattle and defendants' cattle were intermingled and some of each

were pasturing on each tract. After the letters all cattle were run onto the 80–acre tract, plaintiff's cattle were identified, and 22 of them were run back onto the 85–acre tract. Asked why all 32 were not returned to plaintiff at that time, Gene replied, "The reason ... was the seven or the eight, nine head, were either—all the cows had small calves, or they were due to freshen and they were left up at our house so we could watch them."

Mary and Gene testified that even after the exchange of letters they continued to do everything they had in the past to fulfill their part of the agreement. Plaintiff conceded that was so.

On October 20, 1985, plaintiff had gates in the perimeter fences of the 85–acre tract padlocked and "no trespassing" signs erected. Asked whether the contract had "worked fine" until then, plaintiff answered, "Yes, I guess so."

Gene acknowledged he performed no work on the 85–acre tract after the gates were locked and the signs went up. He explained, "[W]e figured we were not welcome anymore." Gene avowed he and Mary remain willing and able to do the same farm chores they had done through the years.

On November 25, 1985, plaintiff's lawyer sent defendants a letter making "formal demand" that defendants surrender possession of the 80–acre tract. Defendants refused. Plaintiff commenced this suit November 27, 1985.

In regard to the ten head of plaintiff's cattle that Gene had not immediately returned, he testified that one, a baby calf, died shortly after its birth. A steer also died, and one cow was "down" and consequently unacceptable to a buyer. Gene had it "hauled off." He retained possession of the remaining seven, insisting that plaintiff pay him $2,250 for 3,000 bales of hay he had cut and stored in a barn on the 85–acre tract. This hay, until the dispute erupted, would have been available for feeding both herds. Mary testified plaintiff ultimately sold the hay to her son-in-law, and defendants received nothing.

Plaintiff had a sale April 19, 1986, at which she sold the cattle Gene had returned, together with farm machinery, household appliances and miscellaneous other items. After the sale she leased the 85–acre tract to a third party for $1,600 per year.

Defendants ultimately turned over plaintiff's remaining seven head of cattle to a buyer who paid plaintiff $1,900 for them.

At trial plaintiff disclosed she has made a new will providing that upon her death the 80–acre tract shall be sold. She refused to reveal how the proceeds are to be disbursed.

The trial court found that when defendants moved onto the 80–acre tract in 1966 it was worth $7,000, and that its value at time of trial was $75,000. The trial court further found: (1) defendants had made improvements to the residence they occupy and had constructed outbuildings on the 80–acre tract, spending approximately $23,000 for materials, (2) when plaintiff needed help caring for Walter after his stroke she called Mary, and Mary provided assistance, (3) plaintiff has not asked defendants for any care or assistance for herself since Walter's death, and after receiving Mary's letter plaintiff has not asked defendants to do any work on the 85–acre tract, and (4) if granted the opportunity defendants are willing to continue to farm the 85–acre tract along with the 80–acre tract, and to provide care for plaintiff under the agreement. Plaintiff does not dispute any of those findings.

In its conclusions of law the trial court stated plaintiff was claiming defendants had not shown full performance of the contract. Plaintiff's contention, said the trial court, was that defendants did not respond to plaintiff's request for a count of the whole herd, but gave plaintiff only a count of her cattle, that defendants had not cleaned the loafing shed for two or three years, and that defendants did not treat plaintiff "like she was their mother."

The trial court concluded that the alleged failure of performance, when weighed against 20 years of performance by defendants and their expenditures for improve-

ments, all in reliance on the agreement to become owners of the 80–acre tract upon the deaths of Walter and plaintiff, fell far short of failure of performance justifying forfeiture. The trial court also concluded that defendants' obligation is a continuing one; should plaintiff for any reason terminate the lease on the 85–acre tract and request defendants to resume farming that parcel along with the 80–acre tract, defendants must do so if they expect to take title to the latter tract upon plaintiff's death. The contract, said the trial court, called for farming both tracts and for the care of plaintiff and Walter until their respective deaths. Farming both tracts together, concluded the trial court, would be mutually beneficial to all parties, and failure of plaintiff to make the 85–acre tract available to defendants for farming with the 80–acre tract would constitute a substantial breach of the contract negating defendants' duty to care for plaintiff.

Having made those determinations the trial court, as reported at the outset of this opinion, denied plaintiff relief on Counts I and II of her petition, and entered judgment for defendants on their counterclaim. The judgment declared that plaintiff shall have "a non-possessory life estate" in the 80–acre tract, that defendants shall have the right of possession to such tract during plaintiff's life, and that upon plaintiff's death defendants "shall take full title to the [80–acre tract] in fee simple absolute, subject to defeasance upon the condition subsequent of Defendants' failure to fulfill their contractual obligations to Plaintiff, to the extent allowed by Plaintiff, as set forth in this decision."

Plaintiff's first point:

"The trial court erred in granting [defendants'] claim for specific performance in the form of a vested remainder in the 80 acre tract because [defendants] failed to meet their burden to establish full performance, so far as lied [sic] within their hands to perform, of an oral contract in that [defendants'] actions of writing [Mary's] letter ..., failing to care for [plaintiff], and seeking payment for the hay crop constituted their breach of the

oral contract and forfeiture of any claim they possessed."

While it might have been argued that the agreement contemplated defendants' ownership in the 80–acre tract would be vested by deed in which Walter and plaintiff would reserve life estates for themselves, the parties obviously treated the agreement as a contract whereby ownership would be transferred to defendants by will, as evidenced by the wills executed by Walter and plaintiff in 1973.

■ An oral contract for a devise is unenforceable because of the statute of frauds, § 432.010, RSMo 1986; however, equity will enforce such a contract where a promisee has performed his part of the bargain and where denial of enforcement would work an equitable fraud on him. *Ver Standig v. St. Louis Union Trust Co.,* 344 Mo. 880, 129 S.W.2d 905, 907 (1939).

Plaintiff concedes the existence of the oral contract and she does not challenge the trial court's findings as to its provisions. Consequently, we need not discuss the requirements for proving an oral contract to make a devise.

Plaintiff also acknowledges that part performance "may take an agreement out of the statute [of frauds]." She cautions, however, that the party seeking enforcement of the contract must have performed as fully as he has been permitted. *Ver Standig,* 129 S.W.2d at 909[10].

It is manifest, of course, that defendants cannot *fully* perform their obligations under the contract so long as plaintiff is alive, as one of defendants' duties is to take care of plaintiff until she dies. Only then will that obligation cease.

■ The trial court found, however, that defendants' performance—up to the time plaintiff prevented further performance by locking her gates and posting the no trespassing signs—was sufficient to prevent forfeiture of defendants' rights under the contract. As we comprehend plaintiff's first point it is that conclusion which she assails. The point avers defendants breached the contract in three ways. We shall consider each separately.

Defendants' first breach, says plaintiff, was Mary's letter which, according to plaintiff, revealed that defendants intended "to not provide full service for the plaintiff."

We find no breach in the letter. While it was intemperate in tone, it was in response to plaintiff's letter of like tenor. Nowhere in Mary's letter did she say defendants would no longer carry out their contractual duties. The letter did warn plaintiff there would be no further free breeding of her cattle, but the trial court did not find that defendants were obliged to supply their bull for plaintiff's cows at no expense to plaintiff, nor did the trial court find the defendants were required to pay veterinarians' bills for services to plaintiff's cattle.

Defendants' second breach, according to plaintiff's first point, was failing to care for plaintiff. Neither the point nor the argument that follows it identifies any specific deficiency. Plaintiff merely refers us to her testimony that "I don't think they treated me like I was their mother." The trial court was not required to believe that testimony, as credibility of witnesses and the weight to be given their testimony in this judge-tried case was for the trial court's determination, the trial court being free to believe none, part or all of the testimony of any witness. *Centerre Bank of Branson v. Campbell,* 744 S.W.2d 490, 498[12] (Mo.App.1988); *Paramount Sales Co., Inc. v. Stark,* 690 S.W.2d 500, 501[2] (Mo.App.1985). However, even if defendants failed to exhibit the degree of tenderness and affection plaintiff thought they should, that would not be a violation of the agreement.

The trial court, as we have seen, found that when plaintiff needed help caring for Walter after his stroke she called Mary, and Mary provided assistance. The trial court also found that plaintiff had not asked defendants for any care for herself since Walter's death, and there was no evidence that plaintiff needed any care that defendants would have been obliged to render under the contract. Plaintiff's claim that defendants breached the contract by failing to care for her is without merit.

The final breach by defendants alleged in plaintiff's first point is defendants' demand that plaintiff pay them for the hay Gene had cut and stored in a barn on the 85–acre tract. On that subject it must be remembered that under the agreement the hay should have been available to defendants for feeding their cattle. Once the gates in the perimeter fences of the 85–acre tract were padlocked and the no trespassing signs went up, defendants had no access to the hay. According to defendants' evidence plaintiff ultimately sold it. Even though defendants received none of the proceeds they eventually released the seven head of plaintiff's cattle they had been holding.

If a party's performance substantially complies with a contract, such performance is sufficient to allow him to recover under it. *Gundaker v. Templer,* 560 S.W.2d 306, 309 (Mo.App.1977). A party's performance is substantial if the deviation from the contract was slight and if the other party received substantially the same benefit it would have from literal performance. *Id.* at 309[8]. Even if defendants' retention of seven head of plaintiff's cattle while defendants sought payment for the hay offended the contract, the cattle were subsequently sold and plaintiff received all the proceeds.

Not every breach of a contract authorizes the other party to abandon it and refuse further performance. *Pasquel v. Owen,* 186 F.2d 263, 270[8] (8th Cir.1950). In order to effect a discharge and warrant an abandonment, the partial failure to perform must go to the very root of the contract. *Id.* Defendants' retention of the seven head of plaintiff's cattle in connection with their demand for payment for the hay, when measured against some 20 years of undisputed performance by them, did not release plaintiff from her contractual duty to devise the 80–acre tract to defendants. Plaintiff's first point is denied.

■ Her second point:

"The trial court erred in concluding that the continuing obligation of [defendants] only arose should [plaintiff] for any reason terminate the lease on her 85 acre home place and request that [defen-

dants] resume farming it along with the 80 acres because such a modification of the oral contract violates the terms of the original contract in that it is without consideration and there is no evidence that [plaintiff] agreed to it."

Plaintiff, as we fathom her second point and the argument that follows it, maintains the trial court was wrong in holding that her lease of the 85–acre tract to a third party freed defendants from their contractual duty to take care of her. Plaintiff insists defendants' duty of care should remain in effect and, if defendants fail to meet a reasonable and proper standard of care they should be divested of any interest in the 80–acre tract.

It is obvious, of course, that inasmuch as the 85–acre tract has been leased to a third party, defendants have no right to enter it and, consequently, no duty to perform any work on it.

The trial court, as noted earlier, found that defendants' right to farm both tracts, as conferred by the contract, was beneficial to them, and that plaintiff's lease of the 85–acre tract to a third party—thereby making it unavailable to defendants—constituted a substantial breach of the contract.

Ordinarily a material breach by one party to a bilateral contract has the simple effect of relieving the opposite party from the duty of further performance. *Burns v. Beeny*, 427 S.W.2d 772, 775[4] (Mo.App. 1968). In *Whitman v. Livingston*, 541 S.W.2d 61 (Mo.App.1976), a service station operator contracted with a sign company to pay the latter $40 per month for 60 months in return for the latter's displaying advertising for the station. The contract provided that if any monthly payment remained unpaid for 30 days the entire contract price would become due and payable immediately. The station operator made some 27 payments, then ceased. The sign company ultimately removed the sign before the 60–month period elapsed. In a suit by the sign company to recover the unpaid amount of the contract, the station operator argued that inasmuch as the sign company removed the sign early it had not fully performed and consequently could not recover. Rejecting that contention the appellate court held that as a general proposition the failure of one party to an entire contract to pay an installment when due is such a breach as will absolve the other party from all obligations to perform while the default continues. *Id.* at 63[1]. Thus, the sign company was not further obligated to maintain the sign for the station operator after his breach of the contract by failing to pay the required installments. *Id.*

The same principle applies here. Plaintiff has a contractual duty to make the 85–acre tract available to defendants for farming in conjunction with the 80–acre tract. Defendants have the concomitant duties to farm both tracts and to take care of plaintiff for the rest of her life. As plaintiff has breached the contract by making it impossible for defendants to farm the 85–acre tract, defendants are absolved from their contractual obligations while plaintiff's breach continues. The trial court correctly recognized this by providing in its judgment that plaintiff's failure to make the 85–acre tract available to defendants for farming constituted a substantial breach of the contract negating defendants' duty to take care of plaintiff, but that if plaintiff terminates the lease on the 85–acre tract and permits defendants to resume farming that parcel along with the 80–acre tract, defendants must do so, and must also take care of plaintiff if they expect to receive title to the 80–acre tract upon her death. Plaintiff's second point is denied.

Having found no merit in either of plaintiff's points we affirm the judgment. In doing so we point out that issues may develop in the future that could require adjudication. If, when the lease on the 85–acre tract expires, plaintiff allows defendants to resume farming it, thereby resurrecting their duty to do so and their duty to take care of plaintiff, questions may ultimately arise as to whether defendants have fulfilled those obligations or whether they have failed, thereby forfeiting the defeasible remainder interest conferred by the judgment. It is also possible,

of course, that defendants could predecease plaintiff, thereby making it impossible for defendants to fulfill the contract. The mechanics for judicial resolution of such problems are not spelled out in the judgment, and we decline to speculate about the matter.

Such possibilities suggest, however, that an award of money damages to defendants, secured by a judgment lien on the 80–acre tract, would have supplied more finality than the remedy fashioned by the trial court. A monetary award, as prayed for by defendants in the event the trial court ejected them, would have allowed the parties to go their separate ways and would not have been haunted by the spectre of future litigation. Plaintiff, however, assigns no error in the trial court's choice of relief.

Appellate review is limited to those issues presented in the appellant's points, and they alone need be considered. *Pruellage v. De Seaton Corp.,* 380 S.W.2d 403, 405[3] (Mo.1964); *Smith v. Welch,* 611 S.W.2d 398, 399[1] (Mo.App.1981). We have, nonetheless, found precedent for the relief the trial court granted. *Gupton v. Gupton,* 47 Mo. 37 (1870), arose from an agreement by an elderly man (Barnett) to devise property to a husband and wife (the Guptons) in return for their taking Barnett and his wife into the Guptons' home and caring for them for the remainder of their lives. The Guptons commenced their duties and Barnett made a will per the agreement. Some five years later a dispute occurred, Barnett and his wife departed the Guptons' home, and Barnett conveyed the property to others. The Guptons sued for specific performance of the contract, or for compensation for its breach. During the litigation Barnett died, survived by his wife. The Supreme Court of Missouri noted the difficulty in deciding what relief to grant in view of the Guptons' duty to resume the care of Mrs. Barnett should she desire that they do so. The Supreme Court, however, approved relief analogous to that awarded by the trial court here. *Id.* at 49.[1]

Judgment affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.

---

**1.** *Easley v. Easley,* 333 S.W.2d 80 (Mo.1960), cited by defendants, is unlike the instant case. In *Easley* the party to whom the duty of care was owed died before suit was filed, hence the court was not faced with the problem about ensuring further performance of the duty of care.