**STEPHENS INDUSTRIES, INC., Appellant,**

v.

**AMERICAN EXPRESS COMPANY,**
Respondent.

No. 25628.

Kansas City Court of Appeals,
Missouri.

June 7, 1971.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 1971.

**502**

John A. Biersmith, Dana B. Badgerow, Kansas City, for appellant.

Sam D. Parker, Daniel M. Dibble and Harlan D. Burkhead, Kansas City, for respondent; Lathrop, Koontz, Righter, Clag-ett, Parker & Norquist, Kansas City, of counsel.

HOWARD, Judge.

This is a suit for the contract price of a machine specially manufactured by plaintiff and sold and delivered to defendant. The machine was to be used along with others by the defendant in processing the record of purchases made by holders of American Express Company credit cards. The company was changing from a punch card operation to a computer operation. In connection with charges made by holders of its credit cards, the company received cards showing the items purchased and the amount of the sale. Such cards had printed on them both the account number applicable to the particular credit card holder and the total amount of the sale. The individual items of the sale and the total amount of the sale were also written on the face of the card. In this new operation the cards were put through a visual scanner which took from them the printed account number and the printed total amount of the sale and recorded it on magnetic tape. Bills were prepared periodically by retrieving from the magnetic tape all of the sales for each account number.

Numerous of these cards had the printed account number or the printed amount of the sale, or both, obscured or defaced or smudged in some manner so that these numbers could not be read by the visual scanner. The visual scanner rejected these cards and it was necessary to further process them so as to make the account number and the amount of the sale readable to the visual scanner so they could be put back through this machine and the numbers and amounts transferred to the magnetic tape. In doing this, it was necessary to cover the imperfect numbers with tape and reinscribe the numbers on the card so they could be read by the visual scanner. The machine manufactured and furnished by plaintiff was supposed to place the tape on the cards to obscure the defective numbers so

they could then be reinscribed and run back through the visual scanner.

Trial to the court without a jury resulted in a decree of rescission and a judgment for the defendant in the amount of $7,500.-00, representing a recovery of a part payment of the purchase price theretofore made by defendant. We shall refer to the parties as they appeared below.

It is believed that a chronological statement of facts will be helpful. On January 30, 1967, plaintiff submitted to defendant a proposal to manufacture and sell the subject taping machine to defendant. On February 23, 1967, the defendant issued its purchase order for the machine. The parties agree that the basic contract price for the machine was $10,000.00. On the next day, February 24, 1967, the defendant forwarded to plaintiff by letter, the specifications for the machine. It thus appears that the contract was embodied in these three documents. These documents were before the trial court but they have not been made a part of this record on appeal.

There was some delay in securing some of the component parts of the machine but pending its completion and delivery, plaintiff issued and sent to defendant its first invoice for 1/3 of the contract price on February 28, 1967. This invoice was not paid.

On March 6, 1967, Mr. Eels was employed by defendant as director of its data preparation department. The importance of the date of this hiring will appear later.

On March 31, 1967, plaintiff issued to defendant its second invoice for 1/3 of the contract price, and on April 30, 1967, plaintiff issued to defendant its third invoice for 1/3 of the contract price. Neither of these invoices was paid by defendant.

On June 15, 1967, plaintiff issued to defendant its invoice for an additional $2,000.-00 for a "concept change" which it claimed to be entitled to under the provisions of the contract. This invoice was not paid by defendant.

On June 1, 1967 and June 22, 1967, plaintiff wrote letters to the defendant. These were attached to the stipulation as Exhibits D and E and were introduced in evidence but they are not part of the record on this appeal. These two exhibits are different from defendant's Exhibits D and E which were introduced in evidence and are a part of this record on appeal. Defendant's Exhibit D is the operating instructions which accompanied the machine and Exhibit E is a photograph of the machine.

On July 21, 1967, the machine was shipped by the plaintiff and it was received by the defendant at its office in New York City sometime during the last week of July, 1967. It appears that there had been delays in securing the other machines which were to be used by defendant in conjunction with the machine here in question and consequently the machine manufactured by plaintiff stood in defendant's office partially uncrated until sometime in December, 1967.

In December 1967, defendant was preparing to use the machine manufactured by plaintiff and the other machines to be used in conjunction therewith. At this time defendant requested that the plaintiff demonstrate and instruct defendant's employees in the operation of the machine. One of plaintiff's vice presidents traveled to New York and on December 18 and 19, 1967, spent eight hours in demonstrating the machine and instructing defendant's employees in the use thereof. Defendant pointedly brought out that it was at this time that plaintiff, for the first time, was informed by defendant that it desired to place tape on two different places on the cards to be processed through the machine.

Shortly after this demonstration, and on December 26, 1967, plaintiff made formal demand for payment of the full purchase price of the machine. Payment was not forthcoming and exactly two months later, on February 26, 1968, plaintiff filed this suit. After such suit was filed and on March 18, 1968, defendant made the first and only payment on the purchase price of

the machine in the amount of $7,500.00. Thereafter, from April 2 to April 8, 1968 (which period ran from a Tuesday to the following Monday), a representative of plaintiff serviced the machine for a total of 43 hours.

It is stipulated that approximately three months later, during the period from July 5, 1968 to August 5, 1968, representatives of the plaintiff made eight "service calls" to work on the machine.

On November 15, 1968, the defendant filed its amended answer to plaintiff's petition, wherein for the first time defendant alleged that because of defects in the machine, it was entitled to rescind the contract. The parties stipulated that prior to this there was no *written* complaint made by defendant to plaintiff concerning defects in the machine.

On January 21, 1969, defendant filed a counterclaim based upon breach of warranty. On September 18, 1969, the cause came to trial and the defendant dismissed such counterclaim. As stated, the trial resulted in a decree of rescission with a judgment for defendant in the amount of $7,500.00 as recovery of its partial payment. Plaintiff has duly appealed to this court contending that by its actions, defendant accepted the machine; that it did not give timely notice of rescission of the contract and that regardless of defects in the machine, plaintiff is entitled to recover the contract price. Defendant contends that the machine was not manufactured according to the specifications required by the contract; that it did not perform the functions for which it was designed; that it was, therefore, entitled to rescind the contract and that it gave timely notice of such rescission.

■ The parties are not really in dispute as to the legal principles that govern the solution of this controversy. Their differences concern the application of such rules to the facts in evidence. Upon delivery of goods, the buyer has a reasonable time within which to determine whether or not the goods conform to the requirements of the contract and whether or not they are fit for the uses intended. If such goods do not conform to the contract or are not fit for the uses intended, the buyer, if he elects to rescind for such reason, must make known his rescission to the seller within a reasonable time after he discovers the defect or after the defect is discoverable. If the contract provides a time for acceptance or rejection, the buyer must act within that time. See Lamar Water & Electric Light Co. v. City of Lamar, 140 Mo. 145, 39 S.W. 768; Missouri Smoke Preventer Co. v. City of St. Louis, 205 Mo. 220, 103 S.W. 513; and Sturgis v. Whisler, 145 Mo.App. 148, 130 S.W. 111. Once the buyer has inspected the goods and has accepted them, he cannot later reject the merchandise and rescind the contract for claimed defects. See Bradford Mills, Inc. v. Vic-Gene Mfg. Co., Mo.App., 430 S.W.2d 597.

■ Absent a specific provision in the contract, the buyer has a reasonable time within which to determine whether or not the goods are defective and such reasonable time depends upon all of the circumstances surrounding the transaction. See Moore v. Smith, Mo.App., 255 S.W. 1071. The actions of the parties may affect what constitutes a reasonable time. Thus, where the buyer complains about defects in the goods and the seller persuades him to keep the goods while the seller attempts to remedy the defects, the reasonable time within which to rescind the contract is extended by such persuasion of the seller. See Goodwin Mfg. Co. v. Arthur Fritsch Foundry & Machine Co., 115 Mo.App. 382, 89 S.W. 911; Monarch Metal Weather-Strip Co. v. Hanick, 172 Mo.App. 680, 155 S.W. 858; Aeolian Co. of Missouri v. Boyd, Mo.App., 65 S.W.2d 111; McCartney v. Taylor Aircraft Co., Mo.App., 140 S.W. 2d 95; and Witte v. Cooke Tractor Co., Mo.App., 261 S.W.2d 651.

■ Where the buyer rejects the goods because of defects therein and tend-

ers them back to the seller, he must thereafter hold such goods as bailee for the seller. He cannot continue to use the goods as his own and still have the benefit of rescission. If he does not, in fact, use the goods as his own but rescinds the contract and holds the merchandise as bailee for the seller, he is not liable for the sale price (assuming the rejection was justified). If, after a proper rejection and rescission, the buyer then uses the goods as his own and in a manner inconsistent with the rights of the seller, such use nullifies the rescission and constitutes an acceptance of the goods as in fulfillment of the contract and the buyer is liable for the price. See Sturgis v. Whisler, 145 Mo.App. 148, 130 S.W. 111; Monarch Metal Weather-Strip Co. v. Hanick, 172 Mo.App. 680, 155 S.W. 858; Aeolian Co. of Missouri v. Boyd, Mo.App., 65 S.W.2d 111; and McCartney v. Taylor Aircraft Co., Mo.App., 140 S.W.2d 95.

In the case at bar the parties dispute whether the machine was defective; whether defendant attempted to reject the machine and rescind the contract and if such an attempt was made, whether it was within a reasonable time; and whether the use made of the machine was such as to make any such rescission or attempted rescission ineffectual. The parties agree that the case law of Missouri as heretofore set out is codified in the Uniform Commercial Code which was enacted prior to this transaction, the applicable sections of which are Sections 400.2–601, 400.2–602 and 400.2–606, RSMo.1969, V.A.M.S.

The evidence reveals that the transaction was made by the plaintiff and defendant in January and February of 1967. Apparently, a Mr. Leccesse, head of defendant's "Methods Assistance Department", made the agreement with plaintiff and determined the specifications for the machine and what it was desired that the machine accomplish. Mr. Leccesse did not testify. Plaintiff produced no witnesses, all of its evidence being by way of stipulation and exhibits thereto. Defendant produced only one witness and that was Mr. Eels, who was

defendant's "Director of Data Preparation". Mr. Eels was not employed by defendant until March 6, 1967, after the contract for this machine had been entered into. Mr. Eels supervised the department which operated the machine. He never had any direct communication with plaintiff or anyone acting for plaintiff, with the exception of the time in December 1967 when one of plaintiff's vice presidents went to New York to demonstrate the machine. Mr. Eels testified generally that the machine would not work properly for more than a day or two at a time. He testified that the machine would at times perform one function satisfactorily and that "Most of our difficulty came in trying to do any other operation with the machine." He testified that the tape feed mechanism would break down; the machine would get out of alignment; cards would go through in groups rather than singly so that tape would not be affixed to each card; that the machine would miss putting tape on some cards and that the cards would not go through straight. There is no evidence that any complaint was ever made to plaintiff about such problems other than what may be inferred from the fact that plaintiff's representatives performed service work on the machine. There is no evidence as to what defects in the machine caused these problems. There is no evidence from which we can determine whether these problems resulted from basic defects in the machine or from improper and inept operation of the machine. It is common knowledge that such machines require continuing adjustment of various movable parts during their operation. A movable guide might become loose during operation and permit the cards to go through crooked but this would not mean a defect in the machine but merely a failure of the operator to secure the guide in place. Since there is no evidence in this record of any complaints made by defendant to plaintiff, or if there were complaints, what the nature of such complaints were, we can only conclude that the defendant did not communicate any attempted rejec-

tion of the machine and rescission of the contract to plaintiff until the filing of their amended answer on November 15, 1968, well over a year after the delivery of the machine in the latter part of July, 1967.

It appears from Mr. Eel's testimony that the machine was designed to place the tape on the front of the card. On cards where the defective number concerned only the total amount of the charge, this presented no problem because the one who reinscribed such number could read it from the hand-written portion of the charge card. However, where the defective number involved the customer's account number, if the tape was placed over this number, the employee could not read the number to reinscribe it. Consequently, such number had to be written on the card by hand before the tape was placed over the account number. This was a time-consuming and costly operation. Therefore, Mr. Eels desired that the tape concerning the account number be placed on the back of the card rather than on the front of the card. The machine was not designed to do this and Mr. Eels testified that the machine would not be satisfactory to him until it could be made to do this job. It is a fair inference from his testimony that most, if not all, of his complaints resulted from attempts to get the machine to place the tape on the back of the card which was a function it was not designed to perform. Furthermore, Mr. Eel's testimony that the machine did not operate properly for more than a day or two at a time and then he would be required to call in servicemen to get it operating again, is refuted by the stipulated evidence that plaintiff's representatives made service calls during only two periods of time. The first was April 2 to April 8, 1968, over three months after the machine had been put in operation, and the second was July 5 to August 5, 1968, almost three months after the April service calls. This does not show a picture of the machine breaking down every day or so or even every week or so.

■ Aside from Mr. Eel's general complaints that the machine did not work properly, there is no evidence in the record to show what defects in the machine caused its improper operation. For all that the record shows, there might have been a basic defect in the machine or it might merely have been a matter of keeping the movable parts in proper alignment. Whatever the defects were, defendant did not communicate them to plaintiff.

From this evidence, we cannot find that the machine did not conform to the specifications provided by defendant or that the machine was in any way defective so as to justify defendant in rejecting it.

■ Even if we were to assume that the machine was, in fact, defective, defendant had it in his possession from the last week in July to the middle of December before an attempt was made to operate the machine. This four and a half month period would normally be more than a reasonable time within which the defendant would be required to determine if the machine conformed to the contract and either accept or reject the machine. Even if we ignore this period before operation, it appears that defendant operated the machine from the latter part of December, 1967 until February 26, 1968, without paying for it and without rejecting it, all before plaintiff filed suit for the purchase price. It was only after suit was filed that any payment was made. Mr. Eels testified that this payment was made as a condition precedent to receiving service on the machine from plaintiff. This testimony is in the nature of a conclusion on the part of the witness and the decision to make the payment was made by other representatives of defendant. Further, the machine was thereafter operated for two and a half months before any other service was had. Any of these periods would constitute a reasonable time for the defendant to determine whether or not the machine was defective and to reject the machine and rescind the contract if it so desired. It did not do so.

Defendant attempts to excuse its delay in rejection by claiming that such delay was induced by promises of plaintiff to make the machine operate to the satisfaction of defendant. The doctrine upon which defendant relies in this connection is well set out as quoted in defendant's brief from the case of Aeolian Co. of Missouri v. Boyd, Mo.App., 65 S.W.2d 111, 1. c. 113, where it is said:

" * * * Ordinarily a delay of four months might well be considered unreasonable as a matter of law, but here plaintiff was continually attempting to put the piano in condition until in September, 1930, very shortly before defendant's rescission was expressed. The rule that a purchaser must rescind promptly upon discovering the misrepresentations of the seller does not apply where the delay in rescission is occasioned by the action of the seller in requesting and inducing the purchaser to continue to try to use the article pending replacements or adjustments. Peterson v. Barbero, 180 Mo. App. 365, 167 S.W. 1180; Neal v. Crowson (Mo.App.) 231 S.W. 1033; D. M. Osborne & Co. v. Henry, 70 Mo.App. 19; Dale v. Pierson-Brewen Commission Co., 160 Mo.App. 314, 142 S.W. 745."

Plaintiff does not dispute the principle as above quoted but the difficulty here is that the record contains not one iota of evidence of promises by plaintiff to remedy the alleged defects and there is nothing in the record to give any indication or from which any inference can be drawn that plaintiff induced defendant to retain the machine and to attempt its continued use pending plaintiff's remedying the alleged defects. The evidence simply does not support this contention of defendant.

We can only conclude that the defendant did not reject the machine and rescind the contract within a reasonable time as required by the foregoing cases and the Uniform Commercial Code sections above cited. Therefore, defendant is liable for the contract price.

■ Plaintiff claims an additional $2,000.00 as a result of a provision for "concept change" which it alleges was contained in the original proposal. That proposal is not before us. We cannot determine from the record what the contract provisions concerning a "concept change" were and there is no evidence in the record upon which a determination can be made as to whether or not there was in fact a "concept change". Thus, there is no evidence to support this claim and plaintiff is not entitled to the additional $2,000.00.

■ Plaintiff also contends that it is entitled to be reimbursed for the services performed by its vice president in demonstrating the machine and by its service representatives in working on the machine. Since the contract is not before us, there is no way that we can determine whether or not any of these items were included within the contractual obligations of plaintiff. Therefore, plaintiff cannot recover for such items.

The judgment is, therefore, reversed, and the cause is remanded with directions to the trial court to enter judgment for the plaintiff in the amount of $2,500.00 (the difference between the contract price of $10,000.00 and the partial payment of $7,500.00 made by defendant), with appropriate interest and costs.

All concur.