PARAMOUNT SALES CO., INC., Appellant,

v.

Raymond STARK, Jr., and Mary Stark, Respondents.

No. 13733.

Missouri Court of Appeals, Southern District, Division Three.

May 7, 1985.

Mark D. Pasewark, James A. Gottschalk, Vogler & Smith, St. Louis, for appellant.

No appearance for respondents.

CROW, Presiding Judge.

Paramount Sales Co., Inc. ("Paramount"), a Tennessee corporation, wholesales "drug sundries," primarily to drugstores and variety stores. Paramount sued Raymond Stark, Jr. ("Ray") and his wife, Mary, claiming that Ray and Mary, doing business as partners under the name "Steelville Drug Store," bought merchandise from Paramount totaling $3,234.93, which sum the Starks refused to pay. The trial court, sitting without a jury, entered judgment for $750 in favor of Paramount and against the Starks. Additionally, the judgment ordered the Starks, at their expense, to return all items "still in the original shipping boxes" to Paramount.

In reaching that decision, the trial court found that not all of the merchandise was merchantable and further found, at least inferentially, that the Starks had rejected the nonconforming items.

Paramount appeals, insisting there was no substantial evidence (a) to support a finding that the "bulk" of the merchandise was nonconforming, or (b) to support a finding that the Starks "rejected the goods as required by the Uniform Commercial Code." Paramount also maintains that the provision in the judgment "permitting" the Starks to return the "unsold" goods to Paramount "for credit" is erroneous, inasmuch as there was no evidence of any such right under the contract.

■ Our review is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (16th ed. 1985), and *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Credibility of witnesses and the weight to be given their testimony is for the trial court, *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App.1985); *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App.1983), which is free to believe none, part or all of the testimony of any witness. *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 206[8] (Mo.App.1984); *Lohrmann v. Carter*, 657 S.W.2d 372, 377 (Mo. App.1983). We assume the trial court believed the testimony and evidence consistent with its judgment. *McComas v. Umlauf*, 641 S.W.2d 809, 812[5] (Mo.App.1982); *McClelland v. Williamson*, 627 S.W.2d 94, 96[2] (Mo.App.1982).

Viewed in light of those principles, the evidence establishes that in the autumn of 1982, Jay Cannon, a sales representative for Paramount, presented a "sales pitch" to Ray, the gist of which was that merchandise obtainable from Paramount, if set up in various displays in the front of the Starks' store, would give the store a "new look."

Ray thereupon placed an order with Cannon for numerous items. According to Ray, Cannon promised that all items would be shipped "at one time," and that he (Cannon) would return and help set up the displays.

A shipment from Paramount subsequently arrived. Michele Garvey, an employee of the Starks', testified that the first few items unboxed were "small jewelry items," which were fine. They were marked with prices and displayed for sale.

The next items opened, "the coasters, the pottery, and the Irvingware," were blemished. Specifically, said Ray, the coasters were "chipped away and faded," there were "flaws" in the pottery, and the Irvingware was "chipped and rusted." Ms. Garvey explained that those items were not "something that we wanted to put out for our customers, we wouldn't purchase it ourselves, so we wouldn't put it on the shelf."

Additionally, the shipment did not contain all of the merchandise Ray had ordered. Consequently, it was impossible to arrange the displays as planned.

Ms. Garvey reported the situation to Paramount's home office by phone. She testified she was told that Paramount would send a representative to inspect anything that was damaged and that the missing merchandise would be "forthcoming soon."

Ray also telephoned Paramount. He testified:

"I called, told them what had happened. Told them I was not satisfied with quality of the merchandise, and asked them if they would send, you know, a prepaid UPS pickup on it, and I wouldn't even unpack the rest of it.

"They refused to do that, said that once I received it, it was my problem and I was stuck with it. Now, those were the words that came from the lady I talked with."

"So, I would have been very happy to have sent it back, but since the merchandise was not up to standard, I didn't see any reason why I should go through $150 worth of shipping cost to get it back to them, when I was receiving inferior merchandise in the first place."

According to Ms. Garvey, the items that had been opened and found unacceptable were put back in their boxes, and they, along with the unopened items, were stored in a back room. Other shipments subsequently arrived and, according to Ray, were stored with the original shipment.

Ray testified he kept calling Paramount but the only response he ever received "was a nasty note saying, you've got to pay for it." Neither Cannon nor any other representative of Paramount ever came by to inspect the merchandise.

The Starks persisted in their refusal to pay. Paramount sued.

The cause was tried approximately a year after the first shipment. Lyman Parsons, Paramount's sales manager, appeared as a witness. Parsons testified that before coming to court, he went inside the Starks' store and observed that some items displayed for sale were identical to items sold by Paramount. Parsons admitted, however, that the items could have come from another distributor.

Ray conceded that his clerks might have put some of the merchandise from Paramount on display for sale, but he insisted that "most of it is still back in the back in the cartons that they came in." [1] Ray had no estimate as to what amount might have been sold.

Ms. Garvey acknowledged that some of the merchandise from Paramount was displayed for sale and that some of the jewelry and a "Country Kitchen" utensil set had been sold.

---

1. Ray explained that the store, including "all the displayed inventory," was sold to a "Mr. Fester" two months before trial. Ray was "managing" the store until the new owner arrived. Ray emphasized that the sale to Fester did not include anything from Paramount which had been withheld from retail display. All such merchandise remained in the back of the store "where it's been sitting ever since I got it."

Paramount's first assignment of error is that the trial court's judgment that the "bulk" of the merchandise was nonconforming is not supported by substantial evidence. Therefore, argues Paramount, the trial court erred in refusing to hold the Starks liable for "the full contract price."

The assignment of error misstates the record. As noted at the start of this opinion, the trial court found that not all of the merchandise was merchantable. Nowhere in the record do we espy a finding that the "bulk" was nonconforming. While the difference may be merely in degree, or perhaps a matter of semantics, we nonetheless point it out before assaying the assignment for merit.

Paramount acknowledges the applicability of the "Uniform Commercial Code—Sales," §§ 400.2–101 to 400.2–725, RSMo 1978,[2] to the dispute between it and the Starks. Citing *R.R. Waites Co., Inc. v. E.H. Thrift Air Conditioning, Inc.*, 510 S.W.2d 759 (Mo.App.1974), Paramount asserts that delivery of conforming goods by a seller to a buyer requires the buyer to accept the goods and pay the seller. Paramount insists that such rule applies here.

Section 400.2–106(2) states:

"Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."

Section 400.2–601 provides, in pertinent part:

"... if the goods ... fail in any respect to conform to the contract, the buyer may

(a) reject the whole; or

(b) accept the whole; or

(c) accept any commercial unit or units and reject the rest."

Section 400.2–105(6) states:

"'Commercial unit' means such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole."

In the instant case, there was substantial evidence that the original shipment of merchandise failed to conform to the contract, in that a considerable number of items ordered by Ray were missing. The amount of the invoice for the first shipment was $2,347.10. At trial, Paramount produced invoices for three of the later shipments which amounted, in the aggregate, to $755.46.[3] Based on the invoices alone, the first shipment was less than 76 per cent of the total order.

More importantly, however, the testimony of Ray and Ms. Garvey was sufficient to support a finding that a substantial number of items in the first shipment were damaged or blemished and therefore nonconforming under the implied warranty of merchantability in § 400.2–314.[4] In that regard, Ms. Garvey explained that after opening the box in which defective items were first discovered, she and another clerk "went through several other of the

---

2. Henceforth, citations of statutes are to RSMo 1978.

3. Although Paramount's petition prayed for $3,234.93, the four invoices mentioned above were the only ones presented in court. They total only $3,102.56. Paramount's attorney told the trial court that Paramount was suing for the latter amount.

4. Section 400.2–314 provides, in pertinent part:

"(1) ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. ...

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

. . . . .

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved. ..."

boxes to see if everything was that way, or if we had just pulled one item that might have had that." She found that most of the items they opened were blemished.

This testimony was sufficient to support a finding that the goods in the initial shipment failed to conform to the contract within the meaning of § 400.2–601 [5] (quoted earlier in part), thereby permitting the Starks to reject that shipment—and those that followed—or to accept any commercial unit or units and reject the rest. § 400.2–601(a) and (c).

While the trial court did not articulate any finding in quite those terms, the trial court did find that the Starks were "not able to merchandise, or sell, certain items, and did not merchandise and sell certain items," and that Ray "has the majority of the shipment at his place of business in the original cartons at this time." These findings are consistent with a determination that a substantial part of the merchandise in the first shipment was nonconforming and that the Starks elected to accept only the conforming commercial units and to reject the nonconforming ones, which the Starks were entitled to do. Such a determination is consistent with the result reached, and is, accordingly, deemed to have been made. *Lackey v. Joule,* 577 S.W.2d 114, 116–17[3] (Mo.App.1978); *Mark Century Corp. v. Tiger Broadcasting Co.,* 509 S.W.2d 737, 740[7] (Mo.App.1974).

We therefore reject Paramount's contention that the evidence "fails to support a finding of defective or nonconforming merchandise." Paramount's first point is, consequently, denied.

Paramount's second assignment of error is that no competent evidence reflects that the Starks "rejected the goods as required by the Uniform Commercial Code." Consequently, says Paramount, the Starks owe Paramount "the full contract price."

Citing § 400.2–606(1)(c), Paramount asserts that acceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership. Additionally, argues Paramount, even if a buyer rejects goods, any subsequent exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller. § 400.2–602(2)(a). Paramount maintains that by reason of these provisions, the Starks, in exposing some of the items for sale and selling some, became liable to Paramount for all merchandise shipped.

In support of this hypothesis, Paramount cites *Stephens Industries, Inc. v. American Express Co.,* 471 S.W.2d 501 (Mo.App. 1971). There, the buyer held a machine for several months after receiving it from the seller, then operated it for several weeks, made a partial payment, then operated it several more months before attempting to reject it. *Stephens* held that the buyer did not reject the machine and rescind the contract within a reasonable time as required by the Uniform Commercial Code and was therefore liable for the contract price. *Id.* at 506–07[10].

The instant case, of course, involves multitudinous items, not just one as did *Stephens.* Furthermore, the trial court, as noted earlier, found that the "majority" of the items shipped by Paramount were kept in their "original cartons" by the Starks and were not offered for sale.

■ *Stephens* teaches that where the buyer rejects the goods because of defects therein and tenders them back to the seller, the buyer must thereafter hold such goods as bailee for the seller. 471 S.W.2d at 504–05[7]. The buyer cannot continue to use the goods as his own and still have the benefit of rescission. *Id.* If the buyer does not use the goods as his own, but rescinds the contract and holds the mer-

---

**5.** Section 400.2–601, the "perfect tender rule," purports to require a seller to perform perfectly, as it provides that a buyer may reject the goods if they fail in any respect to conform to the contract. White and Summers, *Handbook of the Law Under the Uniform Commercial Code,* pp. 303–04 (2d ed. 1980). However, as the evidence in the instant case was sufficient to support a finding of extensive nonconformity, it is unnecessary to decide whether Paramount would have had to make a perfect tender in order to recover the full contract price.

chandise as bailee for the seller, the buyer is not liable for the sale price (assuming the rejection was justified). *Id.* at [8]. If, after a proper rejection and rescission, the buyer then uses the goods as his own and in a manner inconsistent with the rights of the seller, such use nullifies the rescission and constitutes an acceptance of the goods as in fulfillment of the contract and the buyer is liable for the price. *Id.*

 While there are circumstances under which a buyer who rightfully rejects goods may have more duties to the seller than merely holding the goods with reasonable care for a time sufficient to permit the seller to remove them, *see* § 400.2–602(2)(b), § 400.2–603, and § 400.2–604, no such obligations arose here. That being so, the Starks' failure to return the nonconforming units to Paramount at the Starks' expense did not constitute an acceptance of those units, nor did it nullify the Starks' rejection of them.

The trial court was correct, of course, in finding that the Starks accepted the units which they marked with prices and displayed for sale. As to that aspect of the case, however, the evidence was imprecise, and there was no effort by either side to identify with exactitude each item exposed for sale and each item retained in the shipping cartons.

 There was substantial evidence to support a finding that the prices of the items exposed for sale by the Starks ranged, in the aggregate, from less than $750 to more than $750, depending on which testimony the trial court found persuasive. Accordingly, the trial court's finding that the Starks owe Paramount $750 for items accepted by the Starks is within the range of the substantial evidence and cannot be disturbed.

As to the items shipped by Paramount and withheld from retail display by the Starks, there was, as we have seen, substantial evidence to support a finding that they were rejected by the Starks because of widespread nonconformity and that Ray seasonably notified Paramount. § 400.2–602(1). As such a determination is consistent with the result reached, it is deemed to have been made. *Lackey,* 577 S.W.2d at 116–17[3]; *Mark Century Corp.,* 509 S.W.2d at 740[7].

We therefore reject Paramount's contention that no competent evidence reflects that the Starks "rejected the goods as required by the Uniform Commercial Code." Paramount's second point is, accordingly, denied.

Paramount's final assignment of error is that the provision in the judgment "permitting" the Starks to return the "unsold" goods to Paramount "for credit" is erroneous because there was no evidence of any such right under the contract. This assignment, as did Paramount's first point, misstates the record. The judgment did not provide that the Starks would be allowed credit for the items they were ordered to return. The judgment merely commanded the Starks to return those items, at their expense. Additionally, the judgment, as finally entered, did not require the return of all *unsold* items, but only those "still in the original shipping boxes." For clarity, we refer to those items as "the rejected goods."

It is obvious, of course, that if the trial court's award of $750 damages to Paramount be upheld—no greater sum being allowed—the provision requiring the Starks to return the rejected goods to Paramount at the Starks' expense is an apparent windfall to Paramount for two reasons. First, it places the shipping cost upon the Starks which, in view of the evidence of the nonconforming quality of the rejected goods, was probably not the Starks' responsibility (though we do not decide that). Second, it seemingly affords Paramount a greater likelihood of getting the rejected goods back than if no such provision were in the judgment. Therefore, upon initial consideration of Paramount's third point, it appears strange that Paramount would attack that provision of the judgment.

What we believe Paramount is attempting to say, however, is that it should have had judgment for the full amount of money

claimed,[6] and that the trial court was wrong in granting relief in the form of a $750 award of money damages and an order to the Starks to return the rejected goods at their expense.

Inasmuch as we have denied Paramount's first two points, and in doing so have found no error of law in the trial court's award of $750 damages, it follows that the judgment will be affirmed so far as the monetary award is concerned. That being the case, we doubt that Paramount desires the judgment to be purged of the provision ordering the Starks to return the rejected goods at the Starks' expense.

As the Starks did not appeal, we need not consider whether they could have successfully challenged such provision. *Goldberg v. State Tax Commission*, 618 S.W.2d 635, 642[6] (Mo.1981); *Jones v. Anderson*, 618 S.W.2d 252, 259[11] (Mo.App.1981). As the provision inures to Paramount's benefit, any error in including it in the judgment is harmless. *Morse v. Johnson*, 594 S.W.2d 610, 615[4] (Mo. banc 1980). We therefore deny Paramount's final assignment of error.

If we have misconceived Paramount's position with respect to the provision regarding the rejected goods, or if we have erred in leaving that provision intact, Paramount can so state by motion for rehearing.

· Judgment affirmed.

PREWITT, C.J., and TITUS, FLANIGAN and MAUS, JJ., concur.