## CIRCUIT COURT OF THE CITY OF WINCHESTER

D. S. Sifers Corp.

v.

Sterling Products, Inc.

January 25, 1993

Case No. (Law) 92–140

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court for trial on January 21, 1993, on the Motion for Judgment of the Plaintiff based upon an alleged contract between the parties and the Defendant's counterclaim. The Plaintiff appeared with its counsel, George W. Johnston, III, and the Defendant appeared with its counsel, Benjamin M. Butler. There were no objections to the prefiled exhibits, and Exhibits 1 to 25 and 1A were admitted into evidence. Evidence was heard *ore tenus* and argued by counsel, at the conclusion of which the Court took the case under advisement and has made the following decision.

### I. *Findings of Fact*

The following facts were found by the greater weight of the evidence.

D. S. Sifers Corporation is a Kansas corporation, whose principle place of business is in Kansas City, Kansas. Don Sifers is the president and sole stockholder of D. S. Sifers Corporation.

Sterling Products, Inc., is a Virginia corporation which is engaged in the manufacture and sale of plastic products.

In early February, 1992, George Willbrandt, President of Sterling Products, Inc., contacted Don Sifers, President of D. S. Sifers Corporation, about Sterling's interest in purchasing a lid mold to be used in an injection molding process to produce plastic lids for reusable plastic cups.

On February 5, 1992, Don Sifers sent George Willbrandt a schematic diagram of Sifers' eight-cavity lid mold. Exhibit 1.

Don Sifers sent Willbrandt two faxes that day, Exhibits 3 and 4, and in Exhibit 3 Sifers stated: "Confirming our earlier fax of today, we will sell you this eight-cavity lid mold for $38,000 as is, FOB Kansas City, MO."

In response to Sifers' February 5 faxes, Willbrandt sent Don Sifers a fax on February 6, Exhibit 5, stating:

> We are sending you a deposit check of $12,500 as "good faith" money *if* we decide to purchase your tool. *The sell price, however, has not been agreed to*, and we will determine the price after we examine the tool.
>
> We look forward to receiving this tool for tests. Please fax me information on how the tool will be shipped. (Emphasis added.)

On February 6, Willbrandt sent Sifers a check for $12,500 which Willbrandt later stopped payment on because of Sifers' delay in locating and shipping the mold.

Sifers responded to Willbrandt's February 6 fax by fax of that same date, Exhibit No. 6, which stated:

> This is in response to your fax of today. I consider your check as good faith money toward the purchase of the mold if it is satisfactory . . . .
>
> I would appreciate it if you would have a 350 ton machine ready to test the mold when it arrives there.

On February 14, 1992, Sifers again sent a fax to George Willbrandt, Exhibit No. 7, which indicated that the mold had been located and was being rigged for shipping which stated, in pertinent part, that:

> I would ask that you shoot the mold on its arrival there and advise us by fax within two working days if it is satisfactory. As you said, you need to see if the mold will work, and I understand that. If the mold is not acceptable, we ask that you advise us of this by fax and ship the mold back within three days after it is delivered to you, freight prepaid to Kansas City.
>
> We believe you will find the mold acceptable and will expect the balance due in two additional equal payments each in 60 days (April 16) and 90 days (May 16). Your deposit of

$12,500 will pay the first installment of the purchase price. We can negotiate the total price.

On February 14, Sifers wrote on his copy of this fax, "OK — but not agree on $38,000 price."

On February 14, Willbrandt sent Sifers a second check for $12,500 and, as of this point, the purchase price had not been agreed to by the parties.

Around the middle of February, 1992, Sterling received an order from Pepsi-Cola Corporation for the production of one million plastic lids of the type manufactured on a 401 mold.

On February 18, 1992, the mold arrived at Sterling's plant, and the mold was set up and tested by Sterling.

On February 20, 1992, Don Sifers and George Willbrandt agreed in a telephone call that the purchase price for the mold would be a total of $20,000, that Sifers would pay 50% of any repairs up to a maximum of $1,500 or a total of $3,000, and that the $7,500 balance due on the mold would be payable in thirty days.

In their February 20, 1992, conversation, Willbrandt told Sifers that repairs and modifications would be required to make the mold production ready, and based on that conversation, the reduction in price was agreed and the other terms of the contract established.

On February 21, 1992, Sterling sent the mold to a machine shop in Winchester, Virginia, where it was repaired at a cost to Sterling of $3,600.

On February 29, 1992, Sterling placed the mold in production and between that date and March 27, 1992, produced approximately 1.4 million plastic lids on the mold, which were accepted by Sterling's customer, Pepsi-Cola.

Sometime between March 1 and March 20, 1992, Willbrandt and his plant manager, Steve Brown, were in Kansas City and met with Sifers concerning another potential equipment purchase, and they did not tell Sifers that they were dissatisfied with the mold and would be returning the mold to him.

Between March 20 and March 31, 1992, there was no contact between Willbrandt and Sifers about the mold.

On March 30, 1992, Sifers attempted unsuccessfully to call Willbrandt with respect to the $7,500 balance due on the mold purchase.

On March 31, 1992, Sifers faxed Willbrandt a letter, Exhibit 20, inquiring about the final payment and stating in pertinent part:

We agreed on February 20 you would send the $7,500 balance on this mold in thirty days. I agreed to pay 50% of any repairs up to $3,000 or $1,500.

Sometime between March 20 and March 31, 1992, Sterling decided that it was dissatisfied with the production performance of the mold.

On March 31, Sifers and Willbrandt talked on the telephone, and Willbrandt told Sifers that he wanted to return the mold, which Sifers refused to allow.

On April 1, 1992, Sifers sent Willbrandt a fax stating his position, Exhibit No. 22, and on April 2, Willbrandt sent Sifers a fax stating his position, Exhibit No. 23, neither of which altered the contract between the parties.

In April, 1992, Sterling produced another one million lids on the mold, which were for Coca-Cola, and which were accepted by Coca-Cola.

## II. *Conclusions of Law*

The parties' negotiations culminated in the agreement whose initial terms were set forth in Sifer's fax of February 14, 1992, Exhibit 7, and which were finalized in the February 20, 1992, conversation between Sifers and Willbrandt, which was after the mold had been inspected and tested by Sterling, whereby they agreed that the price for the mold was $20,000, less one-half of the repair costs up to $3,000, and that the balance of $7,500 to be paid in thirty days or by March 20, 1992. *See* Virginia Code § 8.2–204.

The manner of the inspection of the mold and the time within which it was to be performed was specified by the parties in their contract. *See* Va. Code § 8.2–513(4). Sterling inspected and tested the mold between February 18 and 20, 1992, and Sterling did not reject the mold after that inspection and testing.

After its initial inspection and testing of the mold, Sterling placed the mold in operation thereby accepting the mold. Va. Code § 8.2–606(1)(b) and (c).

The principles governing revocation of acceptance under Virginia Code § 8.2–608 were discussed by the Supreme Court of Virginia in *Gasque v. Mooers Motor Car Co.*, 227 Va. 154, 161, 313 S.E.2d 384 (1984):

In deciding whether the remedy of revocation of acceptance is applicable, the fact-finder must resolve additional issues: whether the buyer unreasonably delayed giving notice of revocation, whether the condition of the goods had substantially changed and whether the buyer had made unjustified use of the goods after giving notice of revocation. As to all these issues, the buyer has the burden of proving by a preponderance of the evidence that his conduct was reasonable. The Uniform Commercial Code has substituted a standard of commercial reasonableness for the stricter standards which formerly prevailed, but the guiding principles are clear. Revocation of acceptance must be made promptly, or within a reasonable time after acceptance, and *the buyer may not use the goods to a material degree and then attempt to revoke. Reece v. Yeager Ford Sales, Inc.*, 155 W. Va. 453, 184 S.E.2d 722 (1971). What constitutes a reasonable time depends upon the facts and circumstances of each case. The time for revocation will ordinarily extend beyond the time for giving notice of breach. *Lanners v. Whitney*, 247 Or. 223, 428 P.2d 398 (1967); *Pedrini v. Mid-City Trailer Depot, Inc.*, 1 Wash. App. 56, 459 P.2d 76 (1969). Where the delay in notification of revocation is brought about because the buyer gave the seller repeated opportunities to correct the defects and the seller procrastinated in accomplishing repairs, the delay is not unreasonable. *Seekings v. Jimmy GMC of Tucson, Inc.*, 130 Ariz. 596, 638 P.2d 210 (1981). But after giving notice of revocation, the buyer holds the goods as bailee for the seller. The buyer cannot continue to use them as his own and still have the benefit of rescission; his continued use becomes wrongful against the seller, unless induced by the seller's instructions or promises. *Stephens Industries, Inc. v. American Express Co.*, 471 S.W.2d 501 (Mo. Ct. App. 1971); *Sellman Auto, Inc. v. McCowan*, 89 Nev. 353, 513 P.2d 1228 (1973). (Emphasis added.)

Sterling accepted the mold, placed the mold in production, and produced a total of approximately 2.4 million plastic lids on the mold, and it has not met the requirements for revocation of its acceptance of the mold.

### III. *Decision*

For the foregoing reasons, it is decided that Sterling is indebted to Sifers in the amount of $6,000 for the remainder of the purchase price of the mold, less $1,500, which is half of the repairs to the maximum of $3,000, and judgment shall enter for $6,000 against Sterling with interest thereon from March 21, 1992, until paid, and the counterclaim will be dismissed.