**J.F. DALEY INTERNATIONAL, LTD., Plaintiff/Respondent,**

v.

**MIDWEST CONTAINER AND INDUSTRIAL SUPPLY CO., Defendant/Appellant.**

**No. 61604.**

Missouri Court of Appeals, Eastern District, Division Four.

March 9, 1993.

Leonard Komen, St. Louis, for defendant/appellant.

Alan J. Agathen, Clayton, for plaintiff/respondent.

CRAHAN, Judge.

Defendant Midwest Container and Industrial Supply Co. ("Midwest") appeals from an adverse judgment for $7,907.57 following a non-jury trial in an action brought by Plaintiff J.F. Daley International, Ltd. ("Daley") based on Midwest's alleged breach of implied warranties of merchantability and fitness for a particular purpose in connection with Midwest's sale of 25,000 plastic bottles to Daley. Midwest's principal contention on appeal is that the judgment is not supported by substantial evidence and erroneously applies the law because the uncontroverted evidence establishes that Daley failed to conduct a reasonable and timely inspection of the goods

and is thereby barred from any remedy. We affirm the judgment of the trial court.

Neither party requested findings of fact or conclusions of law and none were issued by the trial court. This court must therefore assume that the trial court resolved all issues of fact in accordance with the result reached. Rule 73.01(a)(2); *Nelson v. Baker*, 776 S.W.2d 52, 53 (Mo.App.1989). In this case, all of the evidence at trial was adduced by Daley and must be reviewed in the light most favorable to Daley as the prevailing party. *Id.*

Daley is in the business of distributing solvents. In October, 1989, Daley placed a telephone order with Midwest for a quantity of 25,000 16–oz. plastic bottles which were to be manufactured from a specified plastic resin. Bottles manufactured from this type of plastic resin could then be subjected to fluorination by a separate company to strengthen the bottles and render them more impervious to the solvents distributed by Daley. After fluorination, Daley would send the empty bottles to its various plants around the country where they would be silk-screened with the appropriate logo, filled with Daley's products and shipped to customers.

Midwest was aware of Daley's requirement that the bottles be manufactured from a particular plastic resin and that the bottles would then be shipped by Daley to another company for fluorination before they could be used by Daley. Midwest was also aware of Daley's need to silk-screen the bottles with product logos before filling them with products. Daley had ordered identical bottles in similar quantities from Midwest on prior occasions with satisfactory results.

In response to Daley's telephone order, Midwest manufactured and shipped the desired quantity of plastic bottles, which arrived at Daley's St. Louis warehouse on October 24, 1989. Upon receipt of this shipment from Midwest, Ms. Conner, Daley's Director of Purchasing, opened the shipping boxes and visually confirmed that the bottles conformed to the order in size and color. Within days thereafter, Daley shipped the bottles to a fluorinator in the Kansas City, Missouri area. After fluorination, the bottles were shipped back to Daley's St. Louis warehouse, arriving on November 2, 1989. Daley stored the bottles there until it received orders for various quantities of bottles from its manufacturing and distribution facilities around the country.

In late November, 1989, Ms. Conner began to receive complaints about defects in the bottles from Daley's warehouse managers around the country. The complaints centered upon two types of defects: (1) the bottles were not properly cylindrical and contained "hard spots" so that when the bottles were slightly inflated as part of the silk-screening process for application of the logo, the bottles would not take the silk-screened imprint correctly; and (2) the bottles contained pin-hole leaks at the collar and along the seams, invisible to the naked eye, which allowed the liquid product to leak out. A great number of bottles were rejected in the silk-screening process. However, the pin-hole leaks were not discovered, in some cases, until the bottles had been filled with Daley's liquid product, in this case furniture polish, and were being held in various warehouses or had been shipped to customers. The complaints to Ms. Conner indicated that the product was leaking out of its containers at those locations.

After she began receiving these complaints about the bottles, Ms. Conner ran tests on about 10 bottles which consisted of filling them with water and squeezing the sides. About 30–40% leaked. Ms. Conner then attempted to contact Midwest's president, Mr. Meentemeyer, but was only permitted to speak with his wife, Midwest's office manager. After Ms. Conner described the problems Daley was experiencing with the bottles, Mrs. Meentemeyer advised that she would need to see some samples of the bottles. Ms. Conner forwarded the requested samples and, shortly thereafter, Mrs. Meentemeyer agreed that the sample bottles were "bad."

Ms. Conner persisted over the next two to three weeks to try to reach some resolution of the problem. Finally, Mrs. Meen-

temeyer informed Ms. Conner that Daley would have to ship all of the bottles back to Midwest so she could inspect them. However, Mrs. Meentemeyer insisted that Daley would have to pay for the freight charges to get the bottles back to Midwest. Ms. Conner testified that it would cost several thousand dollars to ship the bottles back to Midwest.

As additional complaints came in from Daley's warehouses, Ms. Conner continued to call Midwest to reiterate the problems with the order. Mrs. Meentemeyer continued to insist that she would have to see all of the bottles and that return of the bottles would be Daley's responsibility. Ms. Conner estimated that thirty to forty percent of the bottles proved to be defective.

In February, 1990, Mrs. Meentemeyer came to Daley's St. Louis warehouse to inspect the bottles remaining there. She agreed that the batch of bottles was "definitely bad" and agreed to "rerun the bottles" if Daley would have them shipped back to Midwest at Daley's expense. Daley filed suit in January, 1991. In September, 1991, Mr. Meentemeyer finally visited Daley's St. Louis warehouse and inspected the remaining bottles. He concurred that they were bad bottles.

In his deposition, Mr. Meentemeyer testified that a problem can occur when the molds do not come together properly and stated that normally not even one percent of any particular run should be defective. Mr. Meentemeyer agreed that it was impossible to detect the defects in the bottles by a visual inspection.

At the time of the trial, approximately 13,500 of the bottles remained at Daley's St. Louis warehouse. Daley was able to use "a couple of thousand" of the bottles before Ms. Conner had to issue orders that branches stop using them. Ms. Conner explained that Daley was having more problems in using the bottles than in not filling orders for customers. Many of the bottles remained in remote warehouses and thousands were destroyed by Daley's customers or by the branch warehouses, presumably due to the problems with leaking bottles.

Our review of this court-tried case is governed by the standards articulated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32.

The parties agree that this dispute is governed by the Uniform Commercial Code as codified in the Missouri Statutes, § 400.2 *et seq.* RSMo.1986.[1] Midwest's position on appeal is that (1) Daley accepted the bottles by failing to reject them after a reasonable opportunity to inspect them as provided in 400.2–606(1)(b); and (2) Daley did not properly revoke such acceptance because it did not satisfy the requirements for revocation set forth in § 400.2–608(2).

We find it unnecessary to determine whether the bottles were accepted by Daley within the meaning of § 400.2–606. Even assuming for sake of argument that Daley's actions constituted acceptance of the shipment, the evidence adduced at trial readily supports a finding that Daley revoked its acceptance in compliance with the requirements of § 400.2–608. That section provides:

**400.2–608. Revocation of acceptance in whole or in part.**—(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discover-

---

1. All further statutory references are to RSMo. 1986 unless otherwise specified.

ed the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Midwest does not dispute the fact that the defects in the bottles substantially impaired the value of the entire lot to Daley. Midwest's president, Mr. Meentemeyer conceded that they were bad bottles. Further, Ms. Conner testified that individual inspection of the bottles to determine which specific bottles leaked would have taken hundreds of man hours. Inasmuch as the costs of such efforts could approach the cost of the entire shipment and, as discussed below, still would not have been sufficient to detect all of the defects, the evidence supported a finding that it was commercially reasonable for Daley to reject the entire lot and not just those that could be proven defective.

■ The evidence also supports a finding that Daley's initial acceptance of the bottles was prior to discovery of the defects and was reasonably induced by the difficulty of discovery. Mr. Meentemeyer, Midwest's president, conceded that it was impossible to detect the defects in the bottles by a visual inspection. However, Midwest urges on appeal that Ms. Conner's testimony about the relatively simple procedure she employed to test a sample of the bottles for leaks after she received complaints from the field compels a finding that the defects were not difficult to discover and, in fact, should have been discovered before the bottles were sent out for fluorination. We disagree.

Whether acceptance was induced by "difficulty of discovery" within the meaning of § 400.2–608(1)(b) or "should have been discovered" within the meaning of § 400.2–608(2) is a question of fact to be determined by the trial court. Contrary to Midwest's contention, the evidence before the trial court was sufficient to support a finding that acceptance was induced by the

difficulty of discovery of the defects in the bottles. Both of the defects established at trial were latent. Although the pinhole leaks could have been discovered by performing the tests ultimately performed by Ms. Conner, that fact alone cannot be considered dispositive. With the benefit of hindsight, it may be confidently assumed that sellers could always point to some sort of test that would have disclosed the existence of a latent defect. The issue is whether the test is one the purchaser should reasonably have been expected to perform earlier. That determination requires a consideration of the facts and circumstances of the particular case. *See* § 400.2–513, UCC Comment 3 (Reasonableness of time, place and manner of buyer's inspection to be determined by trade usage, past practices between the parties and other circumstances of the case); *See also, David Cooper, Inc. v. Contemporary Computer Systems, Inc.*, 846 S.W.2d 777, (Mo.App.S.D.1993) (what constitutes reasonable time within which to determine whether goods are defective depends upon all of the circumstances surrounding the transaction).

Here the evidence established that Daley had purchased similar bottles from Midwest on prior occasions and that the bottles had always proved satisfactory for Daley's purposes. Thus, the past practices between the parties supported a finding that Daley had no reason to believe that it would be necessary to test the bottles upon receipt to determine whether they would hold liquids. There was no evidence that such tests would normally be performed at that stage according to trade usage. Ms. Conner's testimony indicated that the expense of the performing such a test on the entire lot would be prohibitive relative to the cost of the bottles. Although it might well have been feasible for Daley to test a sampling of the bottles, Midwest's intransigent attitude as revealed by the record supports the inference that it would not have been satisfied with a sampling of just ten bottles. Even a one percent sample would have entailed testing of at least 250 bottles. Moreover, the limited test Ms.

Conner ultimately performed would not have revealed the "hard spots" and other defects encountered in silk-screening the bottles which accounted for a substantial portion of the bottles rejected in the manufacturing process. In light of this evidence, the trial court could reasonably have concluded that Daley was not precluded from revoking its acceptance by its failure to discover the defects in the bottles in a more timely manner.

■ We must also reject Midwest's contention that fluorination of the bottles was a "substantial change in the condition of the goods not caused by their own defects" which precluded Daley from revoking its acceptance under § 400.2–608(2). The purpose of conditioning the right to revoke acceptance on the absence of substantial change in the condition of goods is to prevent the buyer from tendering back to the seller goods which have materially *deteriorated* for reasons other than the defects for which the seller is responsible. *See* § 400.2–608, UCC Comment 6. Nothing in the record supports the conclusion that fluorination had any effect on the bottles other than rendering them suitable for certain uses in addition to those which could have been made in the absence of fluorinization—*i.e.*, the bottles were stronger and could therefore carry solvents in addition to other liquids. Under the evidence presented, the trial court could properly find that this was not a "substantial change" preventing Daley from revoking its acceptance.

■ Finally, Midwest urges that even assuming Daley properly revoked its acceptance, Daley is not entitled to a refund of its purchase price because it destroyed a large quantity of the bottles and thereby violated its obligations as Midwest's bailee as to the bottles it had rejected, citing § 400.2–603(1). That provision requires a buyer rejecting goods in his possession to abide by any reasonable instructions received from the seller with regard to the goods and, in the absence of such instructions, to make reasonable efforts to sell the goods for the seller's account if the goods are perishable or threaten to decline rapidly in value. In this case, however, there was no evidence of any instructions by Midwest other than to ship the bottles back to Midwest at Daley's expense. As Daley points out, § 400.2–603(1) further provides that a seller's instructions are not reasonable if, on demand, indemnity for expenses is not forthcoming. Midwest repeatedly declined to pay for return shipment of the bottles. Thus, Daley had no obligation to abide by Midwest's instructions. Further, according to Ms. Conner, Mrs. Meentemeyer indicated that Midwest would have ground the bottles up for remanufacture. Thus, the evidence supports the inference that the remaining bottles were of little or no value to anyone else, thereby excusing any effort by Daley to sell them on the open market.[2]

For the foregoing reasons, the judgment of the trial court is affirmed.

CARL R. GAERTNER, P.J., and CRANE, J., concur.

---

**2.** We note also that Daley's calculation of its damages, which was accepted by the trial court and was not contested by Midwest in its appeal, properly included a credit to Midwest for the price of bottles actually used by Daley. *See Paramount Sales Co., Inc. v. Stark,* 690 S.W.2d 500, 505 (Mo.App.1985).